**AUTOSKILL, INC., A Canadian corporation, Plaintiff,**

v.

**NATIONAL EDUCATIONAL SUPPORT SYSTEMS INCORPORATED, A New Mexico corporation, Defendant.**

No. 91–960–M Civil, CV91–0740M.

United States District Court,
D. New Mexico.

April 21, 1992.

John R. Lansdowne, Robert N. Singer, Ross B. Perkal, Albuquerque, N.M., for defendant.

Robert Wooten Harris, Albuquerque, N.M., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MECHEM, Senior District Judge.

This matter came on for consideration on the motion of Autoskill Inc. (Autoskill) for a preliminary injunction against National Educational Support Systems, Inc. (NESS) based upon copyright infringement and misappropriation of trade secrets. A hearing was held on this matter from December 12–17, 1991. Prior to this hearing, NESS filed suit in this court for declaratory judgment in case No. Civ. 91–740–M that its computer reading software program did not infringe upon Autoskill's reading software system and for other relief. A hearing was held on that matter in August, 1991. These cases have been consolidated. My Findings of Fact and Conclusions of Law relating to Autoskill's motion for preliminary injunction pursuant to Fed. R.Civ.P. 52 follow.

### Findings of Fact

#### Jurisdictional Facts

1. Autoskill is a Canadian Corporation, with its principal place of business in Ottawa, Canada, which sells software used in the teaching of reading.

2. NESS is a New Mexico Corporation with its principal place of business in Albuquerque, New Mexico which also sells software used in the teaching of reading.

3. The matter in controversy exceeds $50,000 exclusive of interest and costs, and is between a citizen of a State of the United States and a citizen of Canada.

4. This matter concerns claims of copyright infringement and trade secret appropriation.

#### Autoskill's Claims

5. As a Canadian national, Autoskill is entitled to claim copyright protection because the protected work was first published in 1985 at which time Canada was a party to the Universal Copyright Convention. 17 U.S.C. § 104(b)(2) (The court takes judicial notice of the historical note accompanying this section.)

6. Autoskill claims that the NESSI Program copied substantially from the Autoskill Program with regard to its sequence, structure and organization; and also with regard to the "total concept and feel" of the Autoskill Program.

7. Autoskill makes no claim that NESS copied its source code. Autoskill therefore claims NESS violated 17 U.S.C. § 106 and other provisions of the Copyright Act.

8. Autoskill prays for preliminary and permanent injunctions pursuant to 17 U.S.C. § 502(a) to restrain what it believes to be further infringement. Autoskill requests impoundment of the NESSI Program during the pendency of the action as allowed under 17 U.S.C. § 503(a). Autoskill also asks for destruction of the NESSI Program, damages and attorneys fees.

9. Autoskill also claims NESS misappropriated its trade secrets and asks for a preliminary injunction restraining NESS' use of trade secrets.

#### Background Facts

10. Autoskill sells computer software used for testing, diagnosis and training in the area of reading (the Autoskill Program). NESS also sells computer software used in testing, diagnosis and training in the area of reading (the NESSI Program).

11. The Autoskill reading program was authored and developed by Dr. Ronald Trites (Trites) and Dr. Christina Fiedorowicz (Fiedorowicz). Edfour Education Consultants did the original computer programming for the Autoskill reading program.

12. Autoskill obtained a certificate of registration for its copyright of the Autoskill Component Reading Sub-skills Testing and Training Program numbered TX 1 742 632 effective January 27, 1986. In the section for indicating the nature of authorship the applicant stated "(h)irer of entire work comprising program and including manual."

13. No evidence exists showing that Autoskill knowingly misled the Copyright Office.

*Access to the Autoskill Program*

14. NESS had access to the Autoskill Program. In 1989, NESS was formed by Ron Neil (Neil) and Byron Manning (Manning). Ron Neil had been employed as salesperson for UNISYS and in that capacity he sold ICON computers with Autoskill software from March or April of 1986 until April 27, 1990. Neil admitted that he and Manning were thoroughly familiar with the Autoskill Program.

15. Negotiations for the purpose of obtaining a license to distribute Autoskill software took place between NESS and Autoskill from about June until November of 1989.

16. While license negotiations were going on with Autoskill, Neil began discussions with Lynn Beckwith (Beckwith) president of a software programming firm Automation Consultants Inc. (ACI) for the purpose of developing a reading software program for NESS. Programming of the NESS reading program began in January 1990 by ACI and Beckwith supervised the work.

17. ACI did the programming for the NESS software.

18. NESS specified the substantive and pedantic content of the NESSI Program to ACI.

19. Mr. Beckwith supervised the NESSI programming.

20. Mr. Beckwith had written on notes of initial conversations with Neil that the Ness software was "to be like AUTOSKILL" and was to be an "AUTOSKILL REPLACEMENT." These notes contained Beckwith's initial understanding of Neil's wishes concerning the NESSI Program.

21. Beckwith had indicated in October 1989 in his notes that "AUTOSKILL PAPERS ARE EXCELLENT" and he testified that prior to that time he had received documents concerning Autoskill's product and techniques.

22. Prior to programming the NESSI Program Beckwith reviewed a document which describes the Autoskill Program in detail.

23. Neil had demonstrated the Autoskill software to Beckwith prior to 1989.

*Description of the Autoskill Program*

24. The following description of the reading program is the "core" of the Autoskill Program which has been a part of the program since it was first used.

25. The Autoskill Program is a reading program that is based primarily upon the identification of three reading sub-types of students who are experiencing reading difficulties.

26. The three specific sub-types of reading deficits which were used in the Autoskill Program are the Type O, Type A, and Type S. Type O is the oral reading sub-type. Type A is the intermodal-associative deficit sub-type and Type S is the sequential deficit sub-type.

27. These sub-types were originally described in an article by Doerhing and Hoshko and a major book by Doerhing, Trites, Patel and Fiedorowicz.

28. The rationale behind the Autoskill Program is to improve the rapid automatic responses of the student to the training stimuli which are broken down in a particular way to train students who belong to the different sub-types.

29. Students are first tested in order to determine their sub-type. The tests are for oral reading, audio-visual matching, visual matching and visual scanning. The tests

are presented in the above sequence. All the tests are administered with the aid of the computer with the exception of the visual scanning test which is a paper and pencil test.

30. The tests are presented according to thirteen different categories of word form types based upon different combinations of consonants and vowels and ranging from single letters to four letters. Words and non-words are used. Accuracy and speed of response are tested and recorded.

31. This baseline testing automatically results in a profile graph of student strengths and weaknesses. From these results the sub-type is determined by reference to specific criteria.

32. From the determination of student sub-types, a corresponding training program is assigned.

33. Training proceeds hierarchically from the simplest skills to the most complex. The training modules are the same three categories used for testing with the exception of the visual scanning. Sub-programs within each module are based upon thirteen categories of word form types. The oral reading module progresses from words to phrases to sentences to paragraphs and grade level is indicated.

34. In training, after each try, the student receives immediate feedback as to whether he is correct or incorrect. The computer records the speed of response.

35. In order to move on to the next sub-program the student must meet certain criteria for speed and accuracy. He must get 95% correct over three consecutive fifty trial blocks with speed no slower than 100 milliseconds.

36. Following each training block, students are presented with graphs which show the results in terms of accuracy and speed.

37. The Autoskill Program contains information and cannot be considered a blank form.

*Facts Relating to Merger*

38. There is no evidence that the idea of testing, diagnosing and training the particular sub-types could be expressed in only one way.

39. The idea of testing, diagnosing and training the particular sub-types is capable of being expressed in more than one way.

40. The thirteen different categories or skill levels, based upon different combinations of vowels and consonants, which both programs utilize are dictated by the letter/sound relationships of the English language. Therefore, this aspect of the Autoskill Program is merged with the idea.

41. The "Silent Sentence" and "Silent Paragraph" components of the Autoskill Program are so standard in the teaching of reading that they cannot be afforded protection.

*Common Aspects of Both Programs*

42. Autoskill contains the following tests: oral reading, auditory visual match, visual match and visual scanning. The NESSI Program contains the following tests: reading aloud, audio identification, visual identification and visual scanning. Although the tests for each program have different names, they employ the same techniques and are substantially the same.

43. The three main sections to each of the programs are testing or diagnosis, profile analysis and training.

44. Students progress from the simplest sub-skills to the most complex.

45. The students in both programs are trained according to the same first three topics for which they were tested and they are trained in substantially the same way.

46. Students in training receive immediate feedback for accuracy.

47. When students attain similar criteria in training, they move on to the next sub-program.

48. Both programs present profiles of speed and accuracy in similar ways.

49. Graphs are used for the same purposes in both programs and in substantially the same ways for both programs.

50. The NESSI Program is substantially similar to the important aspects of the Autoskill Program.

*Other Circumstantial Evidence of Copying*

51. There were some minor changes in format which had no pedagogical value.

52. NESS changed the names of the tests and the sequence of the tests.

*Uniqueness*

53. Both Dr. Olson and Dr. Moya testified that there were many unique aspects of the Autoskill Program.

54. I find that the testimony of Dr. Norton as to the lack of uniqueness of the Autoskill Program is less convincing than that of Dr. Olson and Dr. Moya.

*Witnesses*

55. Dr. Olson has a strong background in both reading education and the use of software in reading education. Dr. Olson is qualified to testify as an expert in this area. Dr. Olson was retained by Autoskill to review the reading programs before Autoskill had decided to sue NESS. Prior to testifying in this case, Dr. Olson reviewed cases and the Nimmer treatise on copyright infringement. Dr. Olson considered the programs as a whole to reach his conclusions regarding substantial similarity.

56. Mr. Johnson–Laird has a strong background in the area of computer software but has no background in the area of reading education or reading education software. In this case, Mr. Johnson–Laird is only qualified to testify as an expert in the area of computer software. Mr. Johnson–Laird is not qualified to testify as to the pedagogical differences in the "look and feel" of the programs. Mr. Johnson–Laird was retained after NESS was sued by Autoskill. Prior to testifying in this case Mr. Johnson–Laird did not review any legal materials on copyright law.

57. Mr. Johnson–Laird found no errors in statements of fact made by Dr. Olson concerning features of both programs.

58. Dr. Norton has a strong background in the teaching of reading as well as in the utilization of computer programs to teach reading. Dr. Norton is qualified to testify as an expert in this area.

59. Dr. Olson spent a significantly longer amount of time operating the programs than did Dr. Norton.

60. Dr. Moya was a rebuttal witness called by Autoskill. He holds a Phd. in education. He was chairman of a bid specification committee for the San Benedito Independent School District. He was also the acting director of technology for the school district.

61. From early 1990 until the summer of 1991, Dr. Moya and the committee members reviewed at least six of the various reading education software products.

62. Based upon the review of several products, the committee recommended the purchase of the Autoskill Program.

63. Dr. Moya operated each program for approximately three to four hours.

64. Dr. Fiedorowicz holds a Phd. in neuropsychology and has done research in the area of reading disabilities. She is competent to testify about reading deficiencies.

65. Mr. Ernest James Foster stabilized the "core" or engine part of the Autoskill Program.

*Laches*

66. Trites was not able to obtain a workable copy of the Ness software until June or July of 1991.

67. It took time for Autoskill to locate an independent expert such as Dr. Olson to analyze both programs.

*Neil's Efforts to Discourage Foster from Testifying*

68. Neil attempted to discourage Foster from testifying in the preliminary injunction hearing.

69. Neil would have reason to believe that Foster's testimony would be favorable to Autoskill.

70. Neil misrepresented the facts concerning the hearing to Foster. Neil admitted stating that nothing would be resolved from this hearing. Foster testified that Neil stated that even Autoskill's attorney did not believe Autoskill stood a chance to succeed in this case. Neil had admitted in an earlier hearing as to the inaccuracy of

that statement being attributed to Autoskill's previous attorney, Mr. James Snead.

### Conclusions of Law

Subject matter jurisdiction exists pursuant to 28 U.S.C. 1338(a) which grants federal courts original and exclusive jurisdiction over copyright infringement claims. Diversity jurisdiction also exists under 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1400(a).

Section 502(a) of the Copyright Act allows this court to issue a preliminary injunction to restrain infringement of copyright. The prerequisites for prevailing on a motion for preliminary injunction are set forth by the Tenth Circuit Court of Appeals in *United States ex rel. Citizen Bank Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc.*, 883 F.2d 886 (10th Cir.1989). First, there must exist a substantial likelihood that the movant will eventually prevail on the merits. Second, the movant must show that he will suffer irreparable harm unless the injunction issues. Next, there must be proof that the threatened injury to the movant outweighs the damage the proposed relief may cause the opposing party. Last, there must be a showing that if the injunction were issued it would not be adverse to the public interest. *Id.* at 889.

### I. Likelihood of Success on the Merits

The issue on this motion for preliminary injunction is whether the evidence presented on this motion convinces me that the plaintiff is likely to prevail at trial. MELVILLE B. NIMMER & DAVID NIMMER, 3 NIMMER ON COPYRIGHT, 14–81–82 (1991 ed.). The issue is not whether infringement has been established as a matter of law. *Id.* The Copyright Act provides that "anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 … is an infringer of the copyright." 17 U.S.C. § 501(a).

Under § 106, the owner of the copyrighted work has the exclusive right (1) to reproduce the copyrighted work in copies and (2) to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106(1), (2).

A "computer program" which is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result" is a copyrightable work. 17 U.S.C. § 101; H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, reprinted in [1976] 5 U.S.C.C.A.N. 5659, 5667. The "source code" is a set of instructions to the computer. *Johnson Controls, Inc. v. Phoenix Control Systems*, 886 F.2d 1173 (9th Cir.1989). The scope of copyright protection is not limited to the source code. *Manufacturers Technologies Inc. v. Cams Inc.*, 706 F.Supp. 984, 1000–1002 (D.Conn. 1989).

### A. Validity of Autoskill's Copyright

In order to establish copyright infringement, Autoskill must show both ownership of a valid copyright and copying by NESS. *See Atari Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.1982), *cert. den.* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). In its post-hearing brief, NESS disputes the validity of Autoskill's copyright.

█ NESS first attacks the validity of the copyright because the copyright application stated that the contributions of all authors were "works for hire." This attack is without merit. First, Autoskill's registration of copyright is prima facie evidence of ownership. *Phoenix Control*, 886 F.2d at 1175. Without citation to authority, NESS argues that in order for Autoskill to claim that the original version of Autoskill CRS was a "work for hire," only Autoskill employees were allowed to contribute to the program. Also without citation to authority, NESS states that "[i]ndependent contractors who contribute to the authorship of a computer program have to be separately listed on the copyright application form, as contributions by an independent contractor to a computer program fall outside the statutory definition of 'work for hire.'" NESS' Post-hearing brief at p. 6.

Under § 101 of the 1976 Copyright Act, a "work made for hire" is: "(1) a work pre-

pared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire...." Autoskill's copyright was obtained in 1986. At that time, this language was construed as not requiring the employee performing the work that is the subject of the copyright to be a formal or regular employee. *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 552 (2d Cir.1984); *see also* 1 NIMMER at 5–14 & 5–15. Because in 1986 Autoskill could not have anticipated that the case law would subsequently change the interpretation of the statute to require that a hiring party show employment in the regular course of business, *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), such an interpretation cannot be retroactively applied to invalidate Autoskill's copyright.

NESS also argues that Autoskill's failure to list Edfour as an author misled the Copyright Office and if done knowingly may constitute grounds for cancellation of the registration. At the hearing, NESS presented no evidence that Autoskill knowing misled the Copyright Office. Second, Autoskill listed Edfour on the application where information regarding "the names of manufacturers who performed certain processes" is requested. Also, NESS' reliance upon *Frank C. Brooks, Jr. v. Williams E. Bates and Knowledge Engineering, Inc.*, 781 F.Supp. 202 (S.D.N.Y. 1991) is misplaced. That case involved the question of transfer of a copyright in which there was no writing evidencing a transfer required under § 204(a). Furthermore, as Autoskill correctly points out, § 201(b) states that "(i)n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed

otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

Last, NESS argues again *without citation to authority* that "it is established practice in the computer software industry to file for a new copyright registration in a computer program at such time as significant improvements or additions are made to the underlying work." NESS' Post-hearing Brief at 7. Autoskill did not register subsequent improvements or changes in its program only until quite recently when it registered Autoskill Version 4. Because Autoskill claims protection for the core of the program which existed in every version of the work since its inception, the issue of non-registration of subsequent Autoskill works is not dispositive. For all the above reasons, NESS has failed to present argument or evidence sufficient to rebut the Autoskill's prima facie showing of the validity its copyright.

B. Circumstantial Evidence of Copyright Infringement—Access and Substantial Similarity

■ Direct evidence of copying is rarely available. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.1987). For this reason, copying may be inferred by resorting to a two pronged test involving circumstantial evidence of: (1) the defendant's access to the copyrighted work and (2) the substantial similarity of defendant's work to the copyrighted work. *Atari*, 672 F.2d at 614. To succeed, plaintiff must prove both prongs. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977). *See also Micro Consulting, Inc. v. Pedro Zubeldia and Medical Electronic Data Exchange, Inc.*, Civ. 88–1348 W at p. 31 (W.D.Okla.1990).

In this case, there is no question that NESS had access to the Autoskill Program. Because Autoskill makes no claim of infringement of the source code, it is not necessary for Autoskill to show that Neil or Manning had access to the source code. The tough question here is whether the NESSI Program was substantially similar

to the Autoskill Program. "[T]he determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law...." 3 NIMMER at 13–23.

### 1. Idea v. Expression

■ To make a determination of substantial similarity, we must first recognize that the primary objective of copyright is "[t]o promote the Progress of Science and useful Arts" Art. I § 8 cl. 8, not to reward the labor of authors. *Feist Publications, Inc. v. Rural Tel. Service Co.,* — U.S. ——, 111 S.Ct. 1282, 1291, 113 L.Ed.2d 358 (1991). For this reason, "copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.* 111 S.Ct. at 1290. Thus, it is a basic rule under copyright law that protection may extend to expression but never to ideas. *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1880). This rule stating the idea/expression dichotomy is codified in the Copyright Act at § 102(b). *See Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240 (3rd Cir.1983). Section 102(b) provides that: "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

NESS argues that as a functional work the Autoskill Program should not be protected under copyright law because § 102(b) excludes from protection processes, procedures, systems, and methods of operation. More is required, however, than a literal application of the language of the statute. *Toro Co., v. R. & R. Products Co.,* 787 F.2d 1208, 1212 (8th Cir.1986). Congress did not intend to enlarge or contract the scope of copyright protection by this language. H.R.REP. No. 94–1476, p. 57 (1976). Its purpose was to restate the law of copyrights leaving "the basic dichotomy between expression and idea" unchanged. *Id.* Therefore, I must go beyond a literal application of the statutory wording and examine the Autoskill Program in light of the case law dealing with the idea/expression dichotomy.

The Supreme Court discussed this dichotomy in *Selden. Selden,* 101 U.S. 99. In that case, the plaintiff, Selden, sought copyright protection for a utilitarian work which explained a system of bookkeeping. The work included bookkeeping forms which were to be used together with the system. The defendant, Baker, had published a book based upon a similar bookkeeping system which contained forms with different columns and headings. The Court held that the art explained in the book could not be protected under copyright law; and if the art could not be used without the methods and diagrams used in the book, those could not be protected either. *Id.* at 103. The term "art" has been used to mean the "idea" of the work. 1 NIMMER at 2–199. Thus, if the methods and diagrams were necessary to the work in that the idea could not be expressed without those methods, the methods were not protectible.

The Court went on to say that "[t]he description of the art in a book, though entitled to the benefit of copyright, lays no foundation for an exclusive claim to the art itself. The object of the one is explanation; the object of the other is use. The former may be secured by copyright. The latter can only be secured, if it can be secured at all, by letters patent." *Id.* at 105. NESS appears to rely upon this quote to support its argument that copyright excludes functional works.

The Third Circuit Court of Appeals rejected this expansive interpretation of *Selden. Franklin,* 714 F.2d at 1251. In that case the appellee argued that operating systems of a computer could not be copyrighted because they were "purely utilitarian works." *Id.* The Franklin Court also explained that such an interpretation was later rejected in *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954). In that case, the Supreme Court stated: "[w]e find nothing in the copyright statute to support the argument that the intended use or use in industry of an article eligible for

copyright bars or invalidates its registration. We do not read such a limitation into the copyright law." *Id.* at 218, 74 S.Ct. at 471, quoted in *Franklin*, 714 F.2d at 1252. The court in *Franklin* thus held that copyright protection could not be withheld from computer operating systems. Therefore, I reject NESS' argument for the same reasoning.

NESS also argues that the facts and arguments in *Selden* are almost identical to those in this case. In that case, *Selden* wanted protection for his ledger forms which were similar to Baker's in text and arrangement of headings and columns. NESS compares this with Autoskill's claim for protection for the structure, sequence and organization of its program. It is certainly true that courts following *Selden* have held that blank forms are not copyrightable and that the Copyright Office Regulations have adopted this rule. *Brown Instrument Co. v. Warner*, 161 F.2d 910 (D.C.Cir.1947); 37 C.F.R. Sec. 202.1(c) (1959). That, however, is not the case here, where the organization of Autoskill's Program cannot be construed as a blank form. *See Digital v. Softklone*, 659 F.Supp. 449 (N.D.Ga.1987) (where the court held that if a work provides information to a user beyond indicating where to record data, the work is copyrightable). Furthermore, to withhold protection to the Autoskill Program merely because protection was not afforded the accounting forms does not take into account the essential holding of that case which is that when ideas cannot be used without employing certain methods and diagrams, those methods and diagrams cannot be protected. *Selden*, 101 U.S. at 103.

The gist of NESS' argument, however, is the legitimate question of whether Autoskill attempts by this action to obtain protection for its *idea* of a computer program which improves a student's reading and verbal language skills. Such a question recognizes the principle of *Selden* that ideas are not to be protected. Further, although expression may be protected, such protection cannot be afforded when the effect is to grant a monopoly over a particular expression which would stop or hinder others from ever articulating the idea. *See* 1 NIMMER 2–204. These issues will be discussed below.

### 2. The Filtering Approach

A basic approach for analyzing the substantial similarity question regarding computer software has been proposed by Professor Nimmer. 3 NIMMER § 13.13[F]. This is the filtering method by which infringement may be established through analyzing the substantial similarity of the protectible expression rather that the work as a whole. *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir.1989). Therefore, before determining the question of substantial similarity it is necessary to eliminate all non-protectible elements from consideration. 3 NIMMER § 13.13[F]. The utility of this approach lies in its practical application to computer programs. *Id.*

In order to proceed with this analysis, then, I will first determine what aspects of the copyrighted program are not protectible. These are unprotected expression, ideas and expression merged with ideas. *See e.g. Softklone*, 659 F.Supp. 449; *Lotus Dev. Corp. v. Paperback Software Int'l.*, 740 F.Supp. 37 (D.Mass.1990). Unprotected expression is that expression which by its very nature cannot be monopolized. For example, there can be no protection for facts. *Feist*, 111 S.Ct. at 1295.

#### a. Autoskill Program—Idea v. Expression

Determining what is idea and distinguishing it from expression is a more difficult question. "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea', and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2nd Cir.1960). "The task is even more daunting in the field of computer software." *Zubeldia* at 22. Furthermore, the 10th Circuit Court of Appeals has not yet addressed this issue.

The Third Circuit Court of Appeals dealt with this question as related to computer software in *Whelan Associates, Inc. v. Jas-*

*low Dental Laboratory,* 797 F.2d 1222 (3rd Cir.1986). There the court held that the purpose of a utilitarian work was its idea and everything else that was not necessary to the purpose of the work or its functioning was expression. *Id.* at 1236. Autoskill urges me to accept the *Whelan* court's reasoning, however I decline to do so. The *Whelan* court's approach although, a temptingly simplistic and bright line test, cannot account for the reality that many ideas may exist in a given work. *See Computer Assoc. Int'l., Inc. v. Altai, Inc.,* 775 F.Supp. 544 (E.D.N.Y.1991). Adopting the *Whelan* rule would also put a damper upon the important goal of encouraging others to build upon the ideas conveyed in a work. *See Feist,* 111 S.Ct. at 1290.

A better approach for determining what is idea as opposed to expression is known as the abstractions test articulated by Judge Learned Hand in *Nichols v. Universal Pictures Corporation,* 45 F.2d 119 (2nd Cir.1930), *cert. den.,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931):

> [u]pon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Id.* at 121.

Although the abstractions approach is not really a test, its usefulness lies in analyzing works containing recurring patterns which can be defined in general themes. *Atari,* 672 F.2d at 616 (7th Cir.1982).

In order to utilize the approach, patterns or components of the program must be placed on a continuum from the most general to the most specific and identify some formulation or definition of the idea. *Lotus Dev. Corp. v. Paperback Software Int'l.,* 740 F.Supp. at 60. Next, the line must be drawn separating ideas from expression. The line drawn must be a pragmatic one and the court must keep in consideration "the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Franklin,* 714 F.2d at 1253, quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971).

In this case, at the highest and most general level of abstraction, the Autoskill Program is a reading program designed to diagnose, re-mediate and teach reading skills through the use of the computer. More specifically, this is accomplished by testing or diagnosis, profile analysis and training of certain sub-types. The Autoskill Program specifically deals with the testing or diagnosing and training of three distinct sub-types—Type O, Type A and Type S. Because these particular sub-types are identified and discussed in the literature available to the public, Autoskill is not entitled to protection from their use by others with testing or, diagnosing, profiling and training. The identification of those sub-types by researchers would be of little value, if such theories were not allowed practical application to real students. Thus, to allow such protection would grant Autoskill a virtual monopoly over those concepts and serve to thwart efforts of others to build upon them. *See Feist,* 111 S.Ct. at 1290.

The manner in which Autoskill utilizes those ideas and communicates them to students and teachers in the context of its reading program amounts to expression. Such expression can extend to the organization, structure and sequence if they are original. *See Feist,* 111 S.Ct. at 1289 (where the Supreme Court stated that selection and arrangement of facts are eligible for protection if the arrangement and selection is original); *see also Whelan,* 797 F.2d at 1248.

### b. Autoskill—Protectible v. Nonprotectible Expression

I now turn to the question of whether such expression is protectible. A few basic principles have emerged that offer guidance for determining which are the

protectible elements of a copyrighted work and which are not. As previously explained, the Supreme Court in *Selden* explained that where an idea cannot be used without employing the methods which are necessary incidents to the idea, those methods cannot be protected. *Selden,* 101 U.S. at 103. This is essentially the rule that idea and expression "merge" where an idea has only one necessary form of expression. Where idea and expression are inseparable protection is not, therefore, extended to the expression. *See also Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738 (9th Cir.1971) (where the idea of a bee pin was indistinguishable from its expression and the court withheld protection).

Accordingly, courts have asked whether an idea is capable of various modes of expression. *Franklin,* 714 F.2d at 1253. To make this determination in the context of computer programs, courts have looked for evidence of other programs in the marketplace which perform the same functions as the copyrighted work without employing the same methodology. *Healthcare Affiliated Services Inc. v. Lippany,* 701 F.Supp. 1142, 1151 (W.D.Pa.1988). Therefore, "[i]f a particular expression is one of a quite limited number of possible ways of expressing an idea, then, ... the expression is not copyrightable." *Lotus,* 740 F.Supp. at 59 (D.Mass.1990).

I begin this examination of the merger question by reiterating the conclusion stated above that the testing, diagnosing and training of the particular sub-types used by Autoskill is an un-protectible idea. The pertinent question then is whether any aspects of expression in the Autoskill Program are merged with that particular idea. Furthermore, the issue of merger is more properly considered in a concrete factual setting as a defense against extending protection rather than as bar to copyrightability. 2 NIMMER 2–204 n. 36.2.

Is this idea capable of various modes of expression? NESS has presented no evidence by way of defense that this idea can be expressed in only one way or even in a limited number of ways. *See Softklone,* 659 F.Supp. at 460 (where the court considered the fact that the defendants never contended that an idea could not have been expressed in a variety of ways to conclude that the idea and expression had not merged). Autoskill's witness, Dr. Olson, has presented testimony that only the Autoskill and NESS Programs use the particular three sub-types for testing, diagnosis and training. In itself, such testimony does not necessarily mean that there are no other ways of expressing the idea.

What is critical, however, is that Dr. Olson testified that there exist many different approaches to diagnosing sub-types. He also stated that Autoskill's particular version of diagnosis differed from that done by the researcher, Doehring although it was related to it. Dr. Olson also testified that there are numerous ways to present profile data on student performance. Autoskill has also presented evidence of varying ways to test and train. Exhibit N presented by Dr. Fiedorowicz states that there are varying ways of presenting material. Autoskill has utilized the bottom-up approach that progression is from the lowest sub-skill of letter identification to the more complex levels. However, some researchers advocate the top-down theory.

Next, although Autoskill used three choices in the multiple choice portions of the testing and training programs, the nature of multiple choice tests does not require the use of three choices. Dr. Norton agreed that the number of choices could be two, three, four or five. Further, the Autoskill Program uses the training to deficit approach, while some researchers espouse the training to strength approach. Thus, I conclude that the idea of testing, profiling, diagnosing and training of the specific sub-types utilized in the Autoskill Program is capable of different modes of expression.

In considering merger, courts also ask whether the expression is dictated by the nature of the idea. *Plains Cotton Coop v. Goodpasture Computer Serv.,* 807 F.2d 1256, 1262 (5th Cir.1987) (where the externalities of the cotton market dictated aspects of a computer program and the court did not afford protection to the copyrighted work). Thus, where there are nec-

essary constraints inherent to an idea which limit its expression, ideas and expression coincide and the expression is not protectible. *Data East U.S.A., Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir.1988) (where certain elements of a computer program were dictated by the essentials of a karate match, the court held that ideas and expression coincided).

Thirteen of the same categories or skill levels based upon different combinations of vowels and consonants were presented to students in both the Autoskill and NESSI Programs. Dr. Norton testified that the English language contains patterns of letter/sound relationships which frequently appear. She testified that she could not find any other listing of patterns that would be simpler or more frequently used than those thirteen categories is an aspect of expression which is dictated by teaching reading in the context of the English language. Thus, this aspect of the Autoskill Program is merged to the idea of testing and training students letter/sound relationships in the English language. Therefore, the thirteen categories of the Autoskill Program must be filtered out of the analysis.

■ A related rule is that protection cannot be granted for *scenes a faire* which are elements standard to a given topic. *Atari, Inc.*, 672 F.2d at 616 & 617 (where the court found that a maze and scoring table were standard game devices). Dr. Olson testified that the "Silent Sentence" and "Silent Paragraph" components of the Autoskill Program employ techniques commonly used in reading programs. I find that both of these aspects of the Autoskill Program are so standard to the field that they cannot be afforded protection and therefore must be filtered out of the analysis. See 3 NIMMER at 13.03[F].

■ To summarize, copyright protection cannot be afforded Autoskill for the idea of testing, diagnosing and training Sub-types O, A and S. The particular way in which Autoskill expresses that idea is protectible with the following exceptions. The thirteen categories of vowel and consonant combinations used in the reading programs is dictated by the use of the English language that it is merged to the idea of the reading program and must be filtered out of this analysis. Silent sentences and silent paragraphs are such standard devices in reading programs that they cannot be considered in analyzing substantial similarity. The question I will now address is whether what remains of the Autoskill Program has been substantially infringed by the NESSI Program.

3. Substantial Similarity

a. Is There Substantial Similarity Between the Two Programs?

■ The focus of this analysis is not whether there is literal similarity between the works but whether the "fundamental essence or structure of one work is duplicated in another ..." *Whelan*, 797 F.2d at 1234 n. 26 quoting 3 NIMMER at 13–25. In order to make this determination, it is proper for to evaluate and rely upon expert testimony. *E.F. Johnson Co. v. Uniden Corp. of America*, 623 F.Supp. 1485, 1493 (D.C.Minn.1985). Such reliance is particularly appropriate in the complex area of reading software programs. Dr. Olson gave various opinions as to what he believed legal conclusions should be in a number of areas based upon his review of legal materials and the programs at issue. Although such opinions may be of help, I need not rely upon such conclusions. *Cf. Franklin*, 714 F.2d at 1250 n. 8. I have relied particularly upon the testimony of Dr. Olson as to the similarities between the programs and the importance of those similarities for teaching reading. I have also relied upon the testimony of Dr. Olson as to the uniqueness of the Autoskill Program.

■ "Infringement may be found where the similarity relates to matter which constitutes a substantial portion of plaintiffs' work—i.e., matter which is of value to plaintiffs." *Atari*, 672 F.2d at 619. Dr. Olson testified that the "guts" or key elements of both programs are the testing and training components of the particular subtypes. Dr. Olson testified that these areas are the most important pedagogically for developing basic skills. The types of tests

for identifying sub-types are reading aloud or oral reading, visual matching or visual identification, auditory-visual match or auditory identification. Dr. Olson testified that no other computer software reading program that he knew of employed the particular methods to test and train the specific sub-types used. These similarities are described below.

As for testing, with the oral reading or reading aloud test, in both programs a word or words come up on the screen and the student attempts to read it orally. Both programs require a trainer to decide whether or not the word is read correctly and to record speed and accuracy into the computer. Second, in the auditory visual matching test or audio identification test, in both programs three word choices appear on the screen and an auditory stimulus of a target word or nonsense word is presented to the student. The student must select which word he hears and indicate his response by hitting the 1, 2 or 3 key. Dr. Olson stated that this keying method is not standard but is present in other programs. Third, in the visual match test or visual identification test, the screen displays four words or nonsense words. The target word is isolated from the other words and the student is expected to choose one of the remaining three words which is identical to the target word. Both programs use alternating words and nonsense words. Dr. Olson testified that no other programs of which he was aware utilized alternating words and nonsense words.

For all three tests in both programs, speed (latency of response) and accuracy are recorded. Dr. Olson testified that utilization of the latency and accuracy data in the student profile was used for diagnosis and treatment in the same way for the two programs, although teachers could make their own choices.

In both programs, the students are trained according to the same three topics for which they were tested and in the same manner as with the testing. In both programs, students receive immediate feedback as to accuracy. Dr. Olson testified that if during training a student's variation

in speed and accuracy is too great from one block to another, the student must keep training. When the variation reaches a certain minimal, level the student is allowed to progress to the next sub-program. The criteria for moving on to the next sub-program is similar for both. Students must attain 95% accuracy over three consecutive trials in each. Dr. Olson stated that this aspect of the program was highly unusual and he was not aware of any other program that did anything like it. Dr. Olson testified that both programs presented profiles of accuracy and speed in very similar ways and that he had not seen anything that really looked like this in other kinds of software.

It is also appropriate for me to analyze lay evidence and exhibits presented by the parties to make a determination of substantial similarity. *See Whelan*, 797 F.2d at 1233. First, presentation of skills proceeds hierarchically from the simple to the complex exists in both programs. Next, a visual scanning test is administered in both programs in combination with the other tests to determine the student's sub-type. Also both programs employ matrices for recording student progress within each section. Last, graphs are used for the same purposes within each program. Based upon my review of lay testimony, exhibits prepared by the parties and in particular the user manuals of each, I find many significant similarities exist between both programs. For all the above reasons, I conclude that Autoskill has made a showing of substantial similarity between the NESSI Program and the most important protectible aspects of Autoskill's Program.

**b. The Total Concept and Feel Test**

Courts have also employed a "total concept and feel" test for substantial similarity that first appeared in *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir.1970). The court in *Sid & Marty Krofft*, 562 F.2d at 1157 developed a two-part test based upon the prior case in which an "extrinsic test" test and an "intrinsic test" were applied. For the "extrinsic test" a court relied upon expert testimony to determine similarity in idea and an "in-

trinsic test" to compare expression based upon the response of an ordinary person. In *Atari*, the court employed the ordinary person test to a question of infringement concerning audiovisual games asking whether the defendant's work captured the "total concept and feel" of the plaintiff's work. *Atari*, 672 F.2d at 620.

The "total concept and feel" test has been criticized by Professor Nimmer. 3 NIMMER at 13–36 & 37. First, the test is more appropriate when evaluating simplistic works where unanalytic evaluation is appropriate. *See e.g. Roth*, 429 F.2d at 1106. The Tenth Circuit Court of Appeals has not addressed this issue. The importance of the role of the fact finder is stressed in the "total concept and feel" test and reliance on expert testimony is not appropriate. *Krofft*, 562 F.2d at 1164. Furthermore, the term "concept" appears to contradict the rule that copyright protection be extended only to expression. 3 NIMMER 13–36 & 37. Likewise the term "feel" is contrary to the necessity of analysis. *Id.*

In this case, the "total concept and feel" test would involve the impressions of the court as to the question of substantial similarity. See *Atari*, 672 F.2d at 619. Because the court did not operate the programs, in order to utilize this test I could only rely upon a few photos of selected screen displays and a logic flow chart. Such a determination would therefore not be meaningful. I would need to rely upon the explanations and impressions of the expert witnesses which is inappropriate. In addition, the reading programs at issue here are complex. For all these reasons, I decline to utilize the "total concept and feel" test in this case.

### c. NESS' Attempt to Show Lack of Substantial Similarity

NESS has presented evidence of differences between the programs. To determine whether NESS has not infringed upon the Autoskill Program it is inappropriate to merely list the similarities and differences and determine who prevails based upon a comparison of the lengths of the lists. *See Atari*, 672 F.2d at 618; *see also* 3 NIM-MER 13–51. Instead, NESS can prevail by proving that the similarities shown by Autoskill are not substantial and the important aspects of the Autoskill Program. *See Whelan*, 797 F.2d at 1245.

First, NESS presented testimony of Mr. Johnson–Laird who is qualified as an expert as to computer software programs but has no experience in the teaching of reading or with computer programs for the purpose of teaching reading. This deficiency is significant because Autoskill's claim for copyright infringement is more importantly based upon the similarities in the important pedagogical aspects of the reading program than upon the similarities of the logic flow between the display screens. Furthermore, as in the case of Dr. Olson, although Mr. Johnson–Laird's testimony as to copyright law may be helpful, legal conclusions of the witness are not binding.

Johnson–Laird presented charts showing the differences between the logic flow between the display screens of both programs and testified as to the differences in the way in which both programs behave. First, the differences illustrated by the chart are misleading because they place the components of each program on an equal footing. This does not account for the relative importance of some components such as testing and training as opposed to the lack of importance of student lists. This deficiency is also evidenced by Johnson–Laird's admission that he did not consider the pedagogical content of the two softwares. Furthermore, I find that the differences by which a student or teacher travels through the program is not as an important aspect of communication or expression with the user as is the testing, profiling, diagnosing, and training aspects described above. From the student or teacher's standpoint the content of what is communicated is more important than how he or she got there.

Johnson–Laird also testified about the differences in the "look and feel" of each program, particularly the visual elements. NESS uses prompts whereas Autoskill does not. Johnson–Laird noted the extensive use of color in the NESSI Program as

opposed to the lack of color in the Autoskill Program. He testified that the word choices appear on the screen in phases in the NESSI Program whereas the all the words appear on the Autoskill screen at the same time. Dr. Olson testified that these differences were superficial and not pedagogically significant. I conclude that these differences are not important or substantial parts of the Autoskill Program. *See Atari*, 672 F.2d at 619 (where differences altering the visual impression of the work were not sufficient to preclude a finding of infringement).

NESS also presented testimony of Dr. Norton who is qualified to testify concerning the teaching of reading and computer programs used for the teaching of reading. Dr. Norton also testified about the differences in the "look and feel" of the two programs. She testified that the use of color in the NESSI Program was another piece of information of use to the student. She testified that color is not trivial. Dr. Norton also testified that the NESSI Program was more contemporary, more robust and had more activities. Nonetheless, I find these added features and enhancements are not enough to defeat the finding of substantial similarity. *Id. See* 3 NIMMER 13–51–52.

Dr. Norton also described the difference in the graphs used by both. The NESSI Program records percentage of accuracy whereas the Autoskill Program records the percentage of error. Dr. Norton testified that this was an important difference. Dr. Olson testified that it did not make a difference which way the data was presented. Even if this is an important difference, I find that when considered with the other differences listed above, it is not enough to disprove the finding of substantial similarity established by Autoskill. I, therefore, conclude that Nessi has failed to disprove the finding of substantial similarity established by Autoskill.

4. Originality and "Sweat of the Brow"

The Supreme Court in *Feist* made clear that originality is the "sine qua non" of copyright protection. *Feist*, 111 S.Ct. at 1289. An analysis of originality can only be based upon the protectible elements of the program. The testimony of Dr. Olson as to originality has been explained above. Based upon his extensive review of the various reading software products, Dr. Moya testified that in his opinion the Autoskill Program was unique. He testified that the program was unique in the following ways: the way in which the computer program recorded mastery and speed; the manner of reinforcement of student responses; the manner of presentation of graphs giving immediate feedback to students, rather than only to teachers and the manner in which the Autoskill Program assessed the abilities of the student and divided them into subtypes. For all these reasons, I conclude that Autoskill has established originality of the protectible elements of the Autoskill Program through the testimony of Dr. Olson and Dr. Moya.

Last, Autoskill has submitted much testimony as to the amount of time and effort it put into developing the Autoskill Program. "Sweat of the brow" evidence is not to be considered in a copyright infringement suit. *Feist*, 111 S.Ct. at 1291. This opinion was not based in any way upon evidence of the time and effort expended by Autoskill in developing its product.

To summarize, I find that NESS had access to the Autoskill Program and that substantial similarity exists between the protectible elements of the Autoskill Program and the NESSI Program. Therefore, I conclude that there is a substantial likelihood that Autoskill will prevail on the merits of its copyright infringement claim at trial on the basis of the evidence presented by both of the parties at the preliminary injunction hearing.

## II. Irreparable Harm

The second prong of the test for the grant of a preliminary injunction requires a finding of irreparable harm. Autoskill argues that a showing of a prima facie case of copyright infringement raises a presumption of irreparable harm. This rule prevails among the circuits. *See e.g. Franklin*, 714 F.2d at 1254; *Phoenix Control*, 886 F.2d at 1174. *Atari*, 672 F.2d at

620. The Tenth Circuit Court of Appeals has not addressed this question, however the District Court of Kansas has stated that in a copyright suit the test for preliminary injunction is less rigorous. *Clark Equipment Corp. v. Harlan*, 539 F.Supp. 561, 567 (D.Kan.1982). In *Harlan*, the court stated that "a copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of copyrighted material is invaded." *Id.* at 569. I agree and I conclude that a presumption of irreparable harm can be made in this case because I have found a likelihood of success on the merits.

Nonetheless, even if the Tenth Circuit were to apply the strict test for copyright infringement, Autoskill has made the required showing. Trites testified that the injuries resulting from the infringement are difficult to quantify. He stated that Autoskill will suffer from a loss of uniqueness in the marketplace. In addition, there was testimony by Trites and Fiedorowicz that if the NESSI Program produced poor results, such results would affect Autoskill's reputation. They maintain that this would lead prospective customers to believe that the Autoskill Program would also produce poor results. Trites also stated that because he did not possess NESS' customer list, he had no way of ascertaining how many customers were lost to NESS. This testimony establishes the fact that the NESSI Program jeopardizes Autoskill's investment and competitive position and thus shows irreparable harm. *See Franklin*, 714 F.2d at 1254. Although these losses are not capable of being calculated or measured, they constitute irreparable harm. *See Standard and Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2nd Cir.1982) (where it was not realistically possible to measure the actual amount of lost sales, the injury was likely irreparable).

### III. Balance of Hardships and Public Interest

NESS has argued that issuance of an injunction would be devastating to NESS, its investors, its employees and customers. However, NESS points to no evidence of this in the record.

Even assuming such a devastating effect, courts have held that a knowing infringer cannot be "permitted to construct its business around its infringement." See *Franklin*, 714 F.2d at 1255; see also *Atari*, 672 F.2d at 620. Because Autoskill showed a substantial likelihood that NESS infringed upon its copyright, I cannot allow NESS to continue. Finally, copyright laws seek to encourage individual effort and creativity, granting a preliminary injunction in this case would uphold those interests and protect the rights of the copyright holder. *Atari*, 672 F.2d at 620.

### Final Matters

As for Autoskill's trade secret claim, I conclude first that questions of fact exist concerning the nature of the confidential relationship between NESS particularly Neil and Autoskill principals Trites and Feidorowidz. Therefore, NESS' motion for summary judgment is denied. Second, I conclude that Autoskill has not sufficiently established the elements on the evidence presented at the preliminary injunction hearing for a showing of trade secret violation necessary to find a substantial likelihood of success on the merits. See NMSA 57-3A-2(D) (1991 Cum.Supp.). Therefore, Autoskill's request for a preliminary injunction on this basis is denied but the question is reserved for a full trial on the merits. Further, I conclude that there is no basis for NESS' affirmative defenses of laches or unclean hands.

Fed.R.Civ.P. 65(c) requires an applicant for preliminary injunction to post a security bond to cover damages, in the event that a party is wrongfully enjoined. Autoskill argues that I should dispense with this requirement because there exists uncontroverted evidence that Autoskill possesses the revenue to respond in damages if it later loses in a damage suit for alleged wrongful issuance of the injunction. Autoskill's reasoning is insufficient to persuade me to dispense with the bond requirement.

Finally, any findings of fact which are more properly considered conclusions of law shall be deemed conclusions of law and any conclusions of law which are more properly considered findings of fact shall be deemed findings of fact.

*Conclusion*

To summarize, I conclude that there exists a substantial likelihood that the NESSI Program infringes on the Autoskill Program. Therefore, Autoskill's motion for preliminary injunction is granted. Bond will be set at $250,000. Last, this injunction extends protection only to the protectible elements of the Autoskill Program from which there is a substantial likelihood that NESS infringed as outlined above. Autoskill has requested that I impound the NESS Program and related material. In light of the nature of this opinion and the following order, the parties are invited to apprise me as to the necessity, feasibility and nature of such impoundment. Now, Therefore,

IT IS ORDERED that NESS and each and every one of its officers, agents, employees and attorneys and each and every person participating with them who receives actual notice of this order by personal service or otherwise, are hereby preliminarily enjoined during the pendency of this action, from doing any of the following acts, or any combination thereof:

1. Manufacturing, reproducing, duplicating, copying, marketing, selling, renting, lending, distributing, displaying or demonstrating any portion of any NESSI Program or user manual which is substantially similar to the protectible elements of the Autoskill Program.

2. Specifically, doing any of the above acts pertaining to that part of the NESSI Program dealing with the sub-types A, O and S in the testing, diagnosing, profiling, training, graphing and recording of results.

3. Manufacturing, reproducing, duplicating, copying, marketing, selling, renting, lending, distributing, displaying or demonstrating any new program, derivative work or user manual which is substantially similar to the protectible elements of the Autoskill Program.

4. Doing any other act which infringes on the protectible portion of the Autoskill Program.

5. Authorizing any other person or firm to do any of the above acts.