**AUTOSKILL INC., a Canadian corporation, Plaintiff–Appellee,**

v.

**NATIONAL EDUCATIONAL SUPPORT SYSTEMS, INC., a New Mexico corporation, Defendant–Appellant.**

**NATIONAL EDUCATIONAL SUPPORT SYSTEMS, INC., a New Mexico corporation, Plaintiff–Appellant,**

v.

**AUTOSKILL INC., a Canadian corporation, Defendant–Appellee.**

No. 92–2118.

United States Court of Appeals, Tenth Circuit.

May 19, 1993.

G. Gervaise Davis, III, of Davis & Schroeder, P.C., Monterey, CA (Scott David Schroeder and Gary C. Shallcross of Davis & Schroeder, P.C., Monterey, CA, and Ross Perkal, Albuquerque, NM, with him, on the brief), for National Educational Support Systems, Inc.

Robert W. Harris, Albuquerque, NM, for Autoskill Inc.

Before BALDOCK and HOLLOWAY, Circuit Judges, and O'CONNOR,* District Judge.

HOLLOWAY, Circuit Judge.

Autoskill, Inc. (Autoskill), a Canadian corporation, in 1986 obtained a certificate of registration of copyright on a computer program designed to test and train students with reading deficiencies. After National Educational Support Systems, Inc. (NESS), a New Mexico corporation, began marketing similar software in 1990, Autoskill sued for copyright infringement in the District of New Mexico. That court had jurisdiction of the claim of copyright infringement asserted under 28 U.S.C. § 1338(a) and 28 U.S.C. § 1332(a). The district court granted Autoskill a preliminary injunction against NESS covering some portions of Autoskill's program, *Autoskill, Inc. v. National Educational Support Systems Inc.*, 793 F.Supp. 1557, 1573 (D.N.M.1992), and NESS appeals. We have appellate jurisdiction granted by 28 U.S.C. § 1292(a)(1). We affirm.

---

* The Honorable Earl E. O'Connor, United States District Judge for the District of Kansas, sitting by designation.

## I. THE FACTUAL BACKGROUND

Beginning in the late 1970s, Dr. Christina Fiedorowicz and Dr. Ronald Trites, the president of Autoskill, developed a computer software program for use in teaching reading skills to students with reading disabilities. After reviewing some research of others, they designed their program to identify students with reading difficulties in three categories or subtypes: Type O, the oral reading subtype; Type A, the intermodal associative deficit subtype; and Type S, the sequential deficit subtype. Autoskill obtained a United States certificate of registration of the copyright on the software Trites and Fiedorowicz developed, effective January 27, 1986, called "Autoskill: Component Reading Subskills Testing and Training Program." 793 F.Supp. at 1559.

NESS was incorporated as a New Mexico corporation in 1989. Two of the principals of NESS, Byron Manning and Ron Neil, were familiar with the Autoskill program. As a salesman for the computer manufacturer UNISYS Corp., Neil sold ICON computers with Autoskill software to educational institutions for about four years between 1986 and 1990. NESS has explained that as "the first alternative for business of the newly organized NESS," Manning and Neil decided to attempt to obtain a license to market the Autoskill program. Brief of Appellant at 15. However, several months of negotiations between NESS and Autoskill ended in late 1989, without an agreement.

With the licensing negotiations with Autoskill still ongoing, Neil began discussions with a computer programming firm, Automation Consultants, Inc. (ACI), about developing a reading software program for NESS. The president of ACI, Lynn Beckwith, wrote in his notes about his initial conversations with Neil that the NESS software was "to be like AUTOSKILL" and was to be an "AUTOSKILL REPLACEMENT." 793 F.Supp. at 1559.

In January 1990, ACI began programming the NESS reading software. NESS specified the substantive and pedantic content of

the NESS program to the programming firm. In addition, NESS gave the programmers copies of some of the published articles that had been used as part of the basis of the Autoskill program, as well as an Autoskill sales brochure. *Id.* By March 1990, the programming firm had produced a preliminary version of the NESS software, called "Nessi: Reading and Language Development Program." Appellant's App. at 391.

With its reading software ready to demonstrate, NESS began a marketing effort in May 1990. *Id.* at 186. A Canadian-based firm, Lifeskills Technology, signed an agreement with NESS to distribute the NESS program in Canada. Both NESS and Lifeskills began hearing rumors that Autoskill was planning to initiate a copyright infringement action against NESS. In April 1991, an attorney for Autoskill sent a letter to Lifeskills stating that Autoskill viewed the NESS software as an infringing program, and warning that Lifeskills could be named in an infringement action. *Id.* at 389–90.

NESS filed a suit in the District of New Mexico in July 1991 for a declaratory judgment that it did not infringe the Autoskill copyright, and other relief. *Id.* at 1, 5–6 (complaint). The district judge issued a temporary restraining order that prohibited Autoskill officers and other employees from interfering with the distribution of the NESS software. On September 25, 1991, Autoskill filed this instant case in the District Court against NESS for copyright infringement and misappropriation of trade secrets, seeking a preliminary injunction, which is at issue here, to prevent continued infringement. Autoskill's action was consolidated with the NESS suit.

On April 21, 1992, the district judge granted Autoskill a preliminary injunction which prohibited NESS from "[m]anufacturing, reproducing, duplicating, copying, marketing, selling, renting, lending, distributing, displaying or demonstrating any portion of any NESSI Program or user manual which is substantially similar to the protectible elements of the Autoskill Program" and "[d]oing any other act which infringes on the protectible portion of the Autoskill Program." 793 F.Supp. at 1573.[1] The judge concluded that Autoskill had shown a substantial likelihood of success on the merits and had prevailed on the other three elements—irreparable harm, proof that the threatened injury outweighed the potential harm to NESS from the injunction, and that the injunction would not be adverse to the public interest. *Id.* at 1572.

## II. APPELLATE JURISDICTION

In a motion to dismiss this appeal, Autoskill argued two theories: (1) the automatic bankruptcy stay of 11 U.S.C. § 362 prevented NESS from appealing the preliminary injunction; and (2) NESS' notice of appeal was untimely because it was filed more than 30 days after the order granting the injunction. We reserved judgment on the jurisdictional question for disposition by the hearing panel.

On April 27, 1992, six days after the district judge entered the preliminary injunction, NESS filed a voluntary petition in the Bankruptcy Court for the District of New Mexico in which it sought relief under Chapter 11. Commencement of the voluntary Chapter 11 case constituted an order for relief under the chapter. *See* 11 U.S.C. § 301. Subsequently, on June 3, 1992, memorializing an oral ruling on June 2, the bankruptcy judge granted Autoskill relief from the automatic stay so that Autoskill might enforce the preliminary injunction. None of the bankruptcy judge's orders are before us for review.

NESS initiated this appeal of the preliminary injunction by filing a notice of appeal on June 26, 1992, the sixtieth day after it filed the Chapter 11 petition and the sixty-sixth day after the injunction issued. On July 7, 1992, Autoskill filed the motion to dismiss the appeal for lack of jurisdiction. NESS then

---

**1.** As part of its separate cause of action for misappropriation of trade secrets, Autoskill sought a preliminary injunction restraining NESS from using "trade secrets of Autoskill, including injunctive relief against any further manufacture, distribution or sale of the Nessi Program." Appellant's App. at 22. The judge granted the preliminary injunction solely on the basis of copyright infringement. As Autoskill did not file a cross-appeal on the judge's failure to address the misappropriation of trade secrets claim, that claim is not an issue on this appeal.

sought a ruling in the bankruptcy court on the applicability of the automatic stay to the appeal, or in the alternative a ruling granting it relief from the automatic stay in order to pursue the appeal. *See* Appellant's App. at 162. On July 16, 1992, the bankruptcy judge ruled that the appeal was permissible on two grounds. First, he held that Rule 6009 of the Bankruptcy Rules controlled; thus, NESS had not needed court approval to prosecute the appeal. *Id.* Second, the judge granted NESS relief from the automatic stay to prosecute an appeal of the preliminary injunction. *Id.*

### A. 11 U.S.C. § 108(b)(2)

We address first the timeliness of NESS' notice of appeal filed outside the 30 days allowed by Rule 4(a) of the Federal Rules of Appellate Procedure.

In arguing that its notice of appeal was timely, NESS relies on the 60–day time period that 11 U.S.C. § 108(b)(2) provides for certain actions by Chapter 11 trustees or debtors in possession.[2] We must decide whether, when the Rule 4(a) 30–day period for filing a notice of appeal has not expired before the filing of a bankruptcy petition, § 108(b)(2) extends the time for filing a notice of appeal for 60 days after the order for relief is entered. Few courts have addressed the question and the issue is one of first impression in our circuit.[3]

Rule 4(a)(1) of the Federal Rules of Appellate Procedure requires a party appealing as of right in a civil case to file a notice of appeal "within 30 days after the date of entry of the judgment or order appealed from." Since the notice of appeal here was filed outside the 30–day time period, NESS relies on § 108(b)(2) of the Bankruptcy Code. In general terms, § 108(b) embodies a longstanding provision in the bankruptcy statutes that "permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights." H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6275; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 30 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5816 (same). Section 108(b) provides:

> Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 60 days after the order for relief.

11 U.S.C. § 108(b). For certain types of actions, then, the statute "allows the trustee 'the later of' two periods, one being the end of the period prescribed by applicable nonbankruptcy law, and the other a specific extension granted by this section." 2 *Collier on Bankruptcy* ¶ 108.02, at 108–5 (15th ed. 1992).

One requirement of § 108(b)—that the relevant time period "has not expired before the date of the filing of the petition"—is not at issue. Since NESS filed the Chapter 11 petition just six days after the district judge entered the preliminary injunction, the 30–day period for filing a notice of appeal had just begun to run. We consider instead

**2.** We note that the bankruptcy judge also concluded that "Title 11 [U.S.C.], § 108(b) and/or (c) is applicable to the acts of the Debtor in prosecuting Debtor's appeal in such case." Appellant's App. at 162.

**3.** Two state court decisions address the effect of § 108(b)(2) on state periods for filing notices of appeal. Both courts interpreted § 108(b)(2) as extending to 60 days the unexpired period for filing notices of appeal. *Production Credit Ass'n v. Burk*, 427 N.W.2d 108, 110–11 (N.D.1988) (applying § 108(b)(2) to extend unexpired 60–day period for filing notice of civil appeal under state rule to 60 days after order for relief, though ruling appeal untimely); *Di Maggio v. Blache*, 466 So.2d 489, 490–91 (La.Ct.App.1985) (explaining § 108(b)(2) extended unexpired 15–day period for filing notice of appeal to 60 days, though holding debtor's appeal was untimely).

whether a notice of appeal is within the scope of the actions that Congress intended to include within the § 108(b) extended period for actions by a trustee or debtor in possession.

Applying the basic canon of statutory construction, "[i]n determining the scope of a statute, we look first to its language." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990); *O'Connor v. United States Dep't of Energy,* 942 F.2d 771, 773 (10th Cir.1991). The critical provision of § 108(b) extends any "period" established by "applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement." The first listed source for the time period, "applicable nonbankruptcy law," is relevant to NESS' appeal. Within the ordinary meaning of the language in the statute, the 30–day time period of Rule 4(a)(1) for filing a notice of appeal is a "period" established under "applicable nonbankruptcy law."

 Section 108(b) applies generally to fixed periods within which a debtor[4] or trustee "may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act." We agree with the courts holding that § 108(b)'s sweeping language "includes the filing of a notice of appeal." *Production Credit Ass'n v. Burk,* 427 N.W.2d 108, 110 (N.D.1988); *Di*

*Maggio v. Blache,* 466 So.2d 489, 490–91 (La.Ct.App.1985). Although § 108(b) does not specifically refer to notices of appeal, the statute includes a broad catchall extending the time in which a debtor or trustee may "perform *any other similar act*" in addition to the steps listed. § 108(b) (emphasis added); *see In re G–N Partners,* 48 B.R. 462, 467 (Bankr.D.Minn.1985) (that § 108(b) is "broader" than listed items "is obvious from its reading"). Filing a notice of appeal is at least a "similar act" with respect to two of the actions specified, filing a "pleading" or a "notice."[5] Consequently § 108(b) gives a debtor in possession or a trustee an extended period for filing a notice of appeal of up to 60 days, as long as the 30–day time period of Rule 4(a) has not expired when the bankruptcy petition is filed.

We feel that under § 108(b) NESS was required to file a notice of appeal "before the later of" either (1) the period provided by applicable nonbankruptcy law, *or* (2) "60 days after the order for relief."[6] The time period under relevant nonbankruptcy law, Rule 4(a)(1), would have expired 30 days after the district judge entered the preliminary injunction on April 21, 1992 or on May 21, 1992. However, the extended 60–day time period provided by § 108(b)(2) began running on the date of the commencement of the Chapter 11 case—April 27, 1992. The 60–day

---

**4.** Though the statute mentions only a trustee, the section also applies to a debtor in possession. *E.g., Martinson v. First Nat'l Bank (In re Martinson),* 731 F.2d 543, 544 n. 2 (8th Cir.1984); *Econo–Therm Energy Sys. Corp. v. Prudential Ins. Co. of Am. (In re Econo–Therm Energy Sys.),* 80 B.R. 137, 139 n. 6 (Bankr.D.Minn.1987); *see also* 11 U.S.C. § 1107(a) (extending rights of trustee to debtor in possession, with some exceptions).

**5.** We are aware that the term "pleading" at times is given a somewhat limited meaning. For example, under Rule 7(a) of the Federal Rules of Civil Procedure, "pleadings" include a complaint, an answer, a reply to a counterclaim, an answer to a cross-claim, a third-party complaint, and a third-party answer. Black's Law Dictionary also gives the term "pleadings" a relatively specific meaning: "The formal allegations by the parties to a lawsuit of their respective claims and defenses, with the intended purpose being to provide notice of what is to be expected at trial." Black's Law Dictionary 1152 (6th ed. 1990).

However, we think the term "pleading" ordinarily has a broader meaning. For example, the

term frequently is used to describe broad categories of documents filed by the parties in court proceedings. *See* American Heritage Dictionary of the English Language 1389 (3d ed. 1992) (defining "pleading" as "[t]he consecutive statements, allegations, and counter allegations made in turn by plaintiff and defendant, or prosecutor and accused, in a legal proceeding"). In § 108(b), we feel that Congress used the term "pleading" in the more generic sense.

We also think that the term "notice" ordinarily is broadly viewed as a statement of information that is communicated. *See* Black's Law Dictionary 1061 (6th ed. 1990). Black's defines "notice of appeal" as "[a] document giving notice of an intention to appeal." *Id.* at 1062. A notice of appeal, then, is plainly a form of notice. In any event, we are convinced that a notice to initiate an appeal is a "similar act" to pleadings and notices as those terms are commonly used.

**6.** As noted earlier, the commencement of the voluntary Chapter 11 case on April 27, 1992, constituted an "order for relief." 11 U.S.C. § 301.

period extended to and included June 26, 1992, the day NESS filed its notice of appeal. NESS thus commenced the appeal within the extended time period provided by § 108(b).

### B. Effect of Rule 4(a) on § 108(b)(2)

■ Autoskill argues that by extending the time for filing a notice of appeal, § 108(b) would override the explicit language of Rule 4(a)(1) which provides a 30–day period for filing notices of appeal "in all civil cases." Fed.R.App.P. 4(a) advisory committee's note. Autoskill would have us determine the effect of the two provisions, § 108(b) and Rule 4(a)(1), by applying the abrogation clause in the Rules Enabling Act, which provides that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072(b).

We cannot agree with Autoskill that Rule 4(a)(1) supersedes § 108(b). The abrogation provision on which such argument is constructed is currently codified at 28 U.S.C. § 2072(b). This statute is generally viewed as applying so as to abrogate conflicting statutes enacted before the rules. *See Penfield Co. v. Securities & Exch. Comm'n,* 330 U.S. 585, 589 n. 5, 67 S.Ct. 918, 921 n. 5, 91 L.Ed. 1117 (1947) ("Where a Rule of Civil Procedure conflicts with a prior statute, the Rule prevails."); 4 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1030 & n. 2, at 125 (2d ed. 1987) ("Statutes enacted prior to the rules that are inconsistent with them are superseded.").

However, a subsequent statute prevails. 2 James N. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 1.02[5], at 1–10 (2d ed. 1992) ("A clearly inconsistent statute enacted subsequent to the Rules' effectiveness would ... supersede or modify any conflicting Rule."). Rule 4(a)(1), with its 30–day time

limit for filing notices of appeal, became effective July 1, 1968.[7] The rule as prescribed in 1967 provided, *inter alia,* that "the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days of the date of the entry of the judgment or order appealed from." 43 F.R.D. at 69; *see also* 28 U.S.C.App. Fed.R.Civ.P. 4(a) (1970). The rule in 1968 thus contained the same provisions, with minor exceptions, as it did in 1978 when § 108(b) was adopted.[8] Therefore, the rule did not abrogate or supersede § 108(b) which was subsequently enacted in 1978.[9]

■ We are persuaded that this interpretation serves the legislative purpose in adopting § 108(b). As is apparent from § 108(b) itself, this bankruptcy provision was included to afford a trustee or debtor in. possession a longer period to determine the advisability of further steps in litigation or business transactions to protect the interests of the bankruptcy estate. Both the House and Senate committee reports contained identical, broad statements that § 108(b) permits "the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights." H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977) U.S.Code Cong. & Admin.News p. 6275; S.Rep. No. 989, 95th Cong., 2d Sess. 30 (1978) U.S.Code Cong. & Admin.News p. 5816.

### C. Effect of the Automatic Stay on § 108(b)(2)

■ Autoskill contends that even if § 108(b) extended NESS' time for filing the notice of appeal, the automatic stay of § 362 then in effect made the filing a void act. Under § 362(a)(1) a petition in bankruptcy

---

7. The Supreme Court prescribed the Federal Rules of Appellate Procedure by an order entered on December 4, 1967. *See* 43 F.R.D. 61, 67. The order made the rules effective on July 1, 1968, after having been reported to the Congress. 28 U.S.C. § 2072; 43 F.R.D. at 113.

8. In our view the two changes that have been made to this language were not substantive, and do not affect our application of § 2072. A 1979 amendment changed the phrase "within 30 days *of* the date" to read "within 30 days *after* the

date." The change was made for "clarity only" and did not change the meaning of the rule. Fed.R.App.P. 4(a)(1) advisory committee's note. In addition, the word "the" has been deleted before the phrase "entry of the judgment."

9. The Bankruptcy Code, including § 108, was approved on November 6, 1978. Bankruptcy Reform Act of 1978, Pub.L. No. 598, 92 Stat. 2549, 2688 (1978). Section 108 became effective on October 1, 1979. *See id.* Pub.L. No. 598, sec. 402(a), 92 Stat. 2682 (1978).

stays the "continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was ... commenced before the commencement" of the bankruptcy proceeding. Autoskill relies upon the rule that § 362 stays "all appeals in proceedings that were *originally brought* against the debtor, regardless of whether the debtor is the appellant or appellee." *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 449 (3d Cir.1982) (emphasis original).

We disagree. Autoskill's argument ignores the first ground cited by the bankruptcy judge in recognizing the validity of the appeal: that Rule 6009 of the Bankruptcy Rules supported NESS' prosecution of the appeal.[10] As we read his ruling, the bankruptcy judge felt that Rule 6009 allowed NESS to prosecute its appeal from the preliminary injunction without obtaining relief from the automatic stay of § 362, and we agree.[11]

Rule 6009 allows a trustee or debtor in possession "[w]ith or without court approval" to "enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding in behalf of the estate." The plain language of Rule 6009 enabled NESS to "commence" this appeal, which certainly was a "proceeding in behalf of the estate." *See* 8 *Collier on Bankruptcy* ¶ 6009.03 & n. 7, at 6009–3 (15th ed. 1992). "Rule 6009, along with Code section 362 itself, makes it clear that the automatic stay does not apply to the continued prosecution of actions by the trustee or debtor in possession. Those entities may continue or pursue litigation without leave of court (or release of stay under section 362)." *Id.* Rule 6009 enabled NESS to prosecute this appeal without the authorization of the bankruptcy court and the notice of appeal was not a void act.

In its memorandum in support of its motion to dismiss this appeal, Autoskill argues that the automatic bankruptcy stay acts to stay an appeal by the debtor from an adverse decision in a nonbankruptcy suit brought against it, such as Autoskill's suit for copyright infringement, citing *St. Croix, inter alia*. There the pendency of a Chapter 11 reorganization petition was revealed in briefs filed with the Third Circuit. That court entered an order staying the appeal, stating that its order "staying this proceeding is without prejudice to the rights of the parties to apply to the Bankruptcy Court for relief from the provisions of section 362...." *Id.* at 449; *see Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036–37 (3d Cir.1991) (applying *St. Croix* rule to stay appeal where debtor filed bankruptcy petition after oral argument but before disposition); *Ingersoll–Rand Fin. Corp. v. Miller Mining Co.*, 817 F.2d 1424, 1426–27 (9th Cir.1987) (staying appeal); *Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207–08 (2d Cir.1986) (same); *Cathey v. Johns–Manville Sales Corp.*, 711 F.2d 60, 62 (6th Cir.1983) (same).

*St. Croix* does not support NESS' motion that we dismiss this appeal as invalid. It is apparent from the order as quoted above that the validity of the appeal in *St. Croix* was not rejected by the Third Circuit and that the court was merely staying the appellate proceeding, affording the parties an opportunity to have the stay of § 362 lifted. That has already been done in the instant case, by application to the bankruptcy court which granted that relief on July 16, 1992, in addition to holding that Rule 6009 of the Bankruptcy Rules controlled, permitting the prosecution of the appeal by NESS.

In sum, we hold that NESS' appeal was timely and valid and deny the motion to dismiss.

---

**10.** The Rules were prescribed by the Supreme Court on April 25, 1983.

**11.** In what seems to have been an alternative ruling, the judge stated that, Rule 6009 notwithstanding, he was lifting or annulling the automatic bankruptcy stay in order to allow NESS to "file a notice of appeal and prosecute an appeal of the preliminary injunction." Appellant's App.

at 162. Further, the judge stated that "[t]o the extent that acts have been taken by the Debtor prior to this Order, the stay is annulled and this Order is effective nunc pro tunc to validate such acts." *Id.* In sum, the judge's order made relief from the stay retroactive. Autoskill did not appeal the order granting NESS relief from the stay.

## III. THE PRELIMINARY INJUNCTION

We turn now to NESS' claims of error in the granting of the preliminary injunction by the district court.

The Copyright Act authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A district judge may grant a preliminary injunction if the moving party demonstrates:

(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir.) (quoting *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980)), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *see also*, *e.g.*, *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992); *Otero Sav. & Loan Ass'n v. Federal Reserve Bank of Kansas City*, 665 F.2d 275, 278 (10th Cir. 1981). The district judge concluded that Autoskill demonstrated all four factors. We will not set aside a preliminary injunction on appeal "[u]nless the district court abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings." 846 F.2d at 1270.

### A. Likelihood of Success on the Merits

■ To demonstrate a substantial likelihood of success Autoskill was required to present "a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781 (10th Cir.1964). Autoskill was not required to show to an absolute certainty that it has a right to prevail on the infringement claim at trial. *See id.* at 781. Rather, under our "liberal definition" of the likelihood of success factor, "[w]hen the other three requirements for a preliminary injunction are

satisfied, 'it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Otero Sav. & Loan Ass'n*, 665 F.2d at 278 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953)).

■ Thus Autoskill was required to present at least a prima facie case of infringement. To prove copyright infringement a plaintiff is required to show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, —— U.S. ——, ——, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). NESS challenges the district judge's conclusion that Autoskill established these elements.

### 1. Ownership of Valid Copyright

■ The Copyright Act provides that a certificate of registration of a copyright "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). By presenting a registration certificate a party establishes the validity of the copyright prima facie and the burden to dispute the validity of the copyright then shifts to the party challenging it. *See Harris Market Research v. Marshall Mktg. & Communications, Inc.*, 948 F.2d 1518, 1526 (10th Cir. 1991). The district judge ruled that NESS failed to present either argument or evidence sufficient to rebut Autoskill's prima facie showing of the validity of its copyright. 793 F.Supp. at 1563.

As proof of ownership, Autoskill presented evidence of the certificate of registration, No. TX 1 742 632, obtained on its reading program. Appellant's App. at 471–72. In the registration certificate Autoskill identified itself as the author of the work and described the nature of its authorship as *"[h]irer of entire work comprising program and including manual." Id.* (emphasis added). We think the "facts stated in the certificate," to which the statutory presumption of validity

extends, logically include the identification of the author and the statement that the entire work was made for hire. By introducing the registration certificate in which it identified itself as the author, then, Autoskill presented prima facie evidence that it was the owner of the copyright. *See Broadcast Music, Inc. v. Moor–Law, Inc.,* 484 F.Supp. 357, 363 (D.Del.1980) ("Where the plaintiff in an infringement action is also the author of the composition, the registration statement is also generally *prima facie* evidence of ownership."); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.-11[C], at 12–158 (1992) [hereinafter *Nimmer* ] (explaining that plaintiff who first registers copyright in plaintiff's name thus obtains certificate that "constitutes prima facie evidence of the validity of his copyright, and of the facts stated therein"). We hold that Autoskill satisfied its initial burden on the ownership element by establishing a prima facie case on this issue.

■■■ NESS argues that the district judge erred factually and legally in ruling that Autoskill was the owner of the United States copyright. One principal contention of NESS is that the judge erred in holding that *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), should not be retroactively applied to this controversy. And under *Reid* NESS says this was not a work made for hire because Autoskill's programmers were not its employees under the common law agency test adopted by *Reid.* Appellant's Brief at 42–43.[12]

On the retroactivity point, we agree with NESS. It is now settled that "[o]nce retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application."

*James B. Beam Distilling Co. v. Georgia,* — U.S. —, ·— – —, 111 S.Ct. 2439, 2447–48, 115 L.Ed.2d 481 (1991); *see Anixter v. Home–Stake Prod. Co.,* 977 F.2d 1533, 1543 (10th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993); *Gray v. Phillips Petroleum Co.,* 971 F.2d 591, 596 (10th Cir.1992). In *Reid* the new rule adopted was applied to the litigants before the Court; hence, selective non-retroactivity is barred in all other cases as to that new rule. Thus *Reid* should be applied here, but this does not carry the day for NESS.

■■■ NESS had the burden of rebutting the statutory presumption of Autoskill's ownership of the copyright. NESS says the "uncontroverted evidence at both hearings is that all versions of the Autoskill programs were programmed in Canada by contract programming companies or individuals, none of whom worked for Autoskill." Appellant's Brief at 42 (footnote omitted). We note that Dr. Trites was asked by NESS' counsel about Edfour Education Consultants,[13] the programming firm used by Autoskill and referred to in Autoskill's copyright certificate as a manufacturer. Trites replied that Edfour was paid under an "independent contract" and its people were not "employees" of Autoskill at the time of that work. Appellee's Supp.App. at 211–12.

The broad assertions by NESS about Autoskill's programming and the sparse evidence it presented on the issue do not address the critical question raised, *i.e.,* whether the Autoskill programmers—companies or individuals—were or were not employees of Autoskill, considering the relevant factors under the "common law agency law meaning." *Reid,* 490 U.S. at 739, 109 S.Ct. at

---

**12.** As a general rule copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The author of a work is usually "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid,* 490 U.S. at 737, 109 S.Ct. at 2171.

The statute provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author" unless the parties agree other-

wise. 17 U.S.C. § 201(b). The Copyright Act defines a "work made for hire" as either "a work prepared by an employee within the scope of his or her employment" or one of certain works specially ordered or commissioned. 17 U.S.C. § 101.

**13.** The trial judge found that Edfour Education Consultants did the original computer programming for the Autoskill program. 793 F.Supp. at 1559.

2172.[14] We have considered the references in NESS' brief which it relies upon, Appellant's Brief at 8–21, 44, and find no substantial evidence identified which addresses the important factors under the common law of agency which NESS relies on. *See supra* note 14. The state of the record is such that this issue—whether the programmers were Autoskill's employees—remains a fair ground for litigation. The prima facie case of Autoskill was not sufficiently rebutted to justify reversal of the preliminary injunction on this point.

■ Furthermore, we note that there was proof on another basis to establish Autoskill's ownership of the copyright. NESS identified Edfour as the contract programmer on the first version of the Autoskill program. Appellant's Brief at 12. With respect to Edfour, there was testimony by Dr. Trites that Autoskill had received an assignment of rights from Edfour.[15] Appellee's Supp.App. at 211–12. The assignment was not in Dr. Trites' possession at the hearing, but the specific testimony about the assignment was given in response to NESS' questioning, it was not objected to nor contradicted, and it is still undisputed at this point.[16]

In sum, we are not persuaded that the preliminary injunction should be reversed on the basis of the ownership showing.

## 2. Copying

In a copyright infringement action a "plaintiff may prove defendant's copying either by direct evidence or, as is most often the case, by showing that (1) the defendant had access to the plaintiff's copyrighted work, and (2) defendant's work is substantially similar to the plaintiff's copyrightable material." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir.1992); 3 *Nimmer* § 13.01[B], at 13–10 to –11. These two types of circumstantial evidence of infringement are accepted because direct evidence of copying is rarely available. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). NESS contends that Autoskill demonstrated neither access nor substantial similarity.

### a. Access to the Copyrighted Work

■ Addressing the access prong, the district judge noted that the founders of NESS, Neil and Manning, were "thoroughly familiar with the Autoskill Program." 793

14. Agency law uses the term "servant" to describe an "employee." *See* Restatement (Second) of Agency § 2 cmt. d, § 220 cmt. g (1958). Determining whether one acts as servant for another involves consideration of a number of fact-based criteria:

(a) The extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (1958).

15. NESS argues that under 17 U.S.C. § 205(d), Autoskill was required to show that any assignment was recorded in the Copyright Office as a prerequisite to bringing an infringement action as a transferee. However, the section requiring recordation as a prerequisite to an infringement action was repealed March 1, 1989, more than two years before Autoskill filed this action. Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853, 2861 (1988) (adopting effective date of Berne Convention, March 1, 1989).

16. NESS also says that on the ownership issue we should apply Canadian law which has no work for hire provision. Appellant's Brief at 44–45. Autoskill argues that the foreign law was not raised below by proper notice as required by Rule 44.1 of the Federal Rules of Civil Procedure. No response to this waiver point was made in the Reply Brief of Appellant NESS and no reference is made by NESS to any place in the record showing proper notice and assertion of the issue below. It may not be relied on here.

F.Supp. at 1559 (finding No. 14). Neil, the judge found, had sold ICON computers for UNISYS with Autoskill software for four years. *Id.* Further, the court found that the supervisor of the programming of the NESS program had reviewed "a document which describes the Autoskill Program in detail." *Id.* (finding No. 22). The judge concluded "there is no question that NESS had access to the Autoskill Program." *Id.*

■ On access, a plaintiff may meet his initial burden by showing that the defendant had a "reasonable opportunity to view" or "opportunity to copy" the allegedly infringed work. 3 *Nimmer* § 13.02[A] & n. 5, at 13–15 to –16; *see also, e.g., Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 277 (6th Cir.1988) (concluding "[a]ccess merely means an opportunity to view the protected material"). We agree that defining access as the "opportunity" to view or copy makes sense for the purposes of shifting the burden to the defendant, and we follow this approach. *See* 3 *Nimmer* § 13.02[A] n. 5, at 13–15. NESS makes no argument that the judge's underlying factual findings on this point are clearly erroneous and those findings establish opportunity.

#### b. Substantial Similarity

■ As the district judge found, the Autoskill program "is based primarily upon the identification of three reading sub-types of students who are experiencing reading difficulties." 793 F.Supp. at 1559. In general, the Autoskill program is designed to improve the student's rapid automatic responses to training stimuli. The Autoskill program first tests the students in order to identify their subtype for training purposes. Autoskill tests students for "oral reading, audio-visual matching, visual matching and visual scanning," in that order. *Id.*

The tests are presented according to 13 categories of word form types, which are based on different combinations of vowels and consonants. The tests use words and nonwords and record accuracy and speed of response. *Id.* at 1560. Based upon the results of the testing in Autoskill, students are assigned a training program that corresponds to their subtypes. "Training proceeds hierarchically from the simplest skills to the most complex." *Id.* Students receive immediate feedback to their responses, and in order to move to the next subprogram must achieve a 95 percent accuracy rate over three, consecutive 50–trial blocks, with a speed of no slower than 100 milliseconds. *Id.*

Comparing the Autoskill and NESS programs, the district judge found numerous similarities and concluded that NESS had merely changed the names and sequence of the tests and had made minor format changes of "no pedagogical value." *Id.* at 1561. The testing categories in the NESS program have similar names to those in Autoskill: "reading aloud, audio identification, visual identification and visual scanning." *Id.* at 1560. The judge found that the three main sections of each program are testing or diagnosis, profile analysis, and training. In both programs, the judge found, students progress from the simplest skills to the most complex and overall are "trained in substantially the same way." *Id.* He also concluded that in both programs students must attain similar criteria during training in order to move to the next level, and that both programs present similar profiles reflecting student speed and accuracy. *Id.*

■ Substantial similarity analysis concludes with a comparison of portions of the alleged infringer's works with the portions of the complaining party's works which are determined to be legally protectable under the Copyright Act. To determine whether any portions of Autoskill's computer program were protectable, the district judge used a three-step method of analysis recommended in 3 *Nimmer* § 13.03[F], at 13–80, a variation of which was recently adopted by the Second Circuit in *Altai:* abstraction, filtration, and comparison.[17] In this preliminary injunction

---

17. We are mindful that *Altai* is just one of the approaches courts have used in analyzing the substantial similarity of computer programs. *See, e.g., Altai,* 982 F.2d at 706 (adopting abstraction, filtration, comparison approach); *Whelan,*
797 F.2d at 1235–36 (adopting rule for separating idea from expression in computer programs); *Gates Rubber Co. v. Bando Am., Inc.,* 798 F.Supp. 1499, 1513 (D.Colo.1992) (adopting modification of *Whelan* approach based on *Dawson v. Hin-*

appeal we need not decide which is precisely the correct method of analysis for a final copyright judgment, *Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1262 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987), because we are satisfied that the trial judge used a permissible method of analysis here; moreover Autoskill showed a likelihood of success in defining as protectable the portions of its program for which the judge granted preliminary injunctive relief, after finding there was substantial similarity between the identified portions of the NESS and Autoskill programs which the judge compared. The choice of the precise test for such analysis can await an appeal requiring that choice, perhaps preferably one from a final copyright judgment.

### 1. The Abstractions Analysis

▇▇▇▇▇ One of the fundamentals of copyright law is that a copyright does not protect an idea, but only the expression of the idea. *See, e.g., Baker v. Selden,* 101 U.S. 99, 104, 107, 25 L.Ed. 841 (1879); *Mazur v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *see also* 17 U.S.C. § 102(b) (codifying idea/expression distinction). This idea/expression dichotomy applies to computer programs. *Altai,* 982 F.2d at 703. Thus, in general, the portions of a computer program that are "ideas" are nonprotectable,

and the portions that represent "expression" may be protected. "Infringement is shown by a substantial similarity of *protectable expression,* not just an overall similarity between the works." 3 *Nimmer* § 13.03[F], at 13–82 (emphasis in original). Separating idea from expression, then, is one of the basic parts of a substantial similarity analysis.

In order to separate idea from expression, the judge here chose an approach known as the "abstractions" test or analysis. In articulating the approach, Judge Learned Hand explained:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). Because Judge Hand's abstractions approach generally "mirrors" the process that computer programmers use,[18] it is particularly suit-

---

*shaw Music Co.,* 905 F.2d 731 (4th Cir.1990), in conjunction with the abstraction test.

However, here the district judge's use of a test like that articulated in *Altai* by the Second Circuit to determine substantial similarity was not at issue. In its brief, NESS noted that the "proper way to examine the issue has been laid out in a number of recent cases ... but the *Altai* case is the most explicit." Appellant's Brief at 30. Of course NESS does argue vigorously that the judge misapplied the *Altai* test. Autoskill cites *Altai* and then states that "the trial court applied an appropriate method, recommended by the Second Circuit in *Altai,*" saying that the method used below runs "very similar to that used by the Second Circuit in *Altai.*" Appellee's Brief at 16.

**18.** A programmer begins by identifying the program's "function," or "what the program actually does, in contrast to its 'implementation,' which is the method, including the instructions, that allow a program to accomplish that function." Steven R. Englund, Note, *Idea, Process, or Protected Expression?: Determining the Scope of Copyright Protection of the Structure of Computer*

*Programs,* 88 Mich.L.Rev. 866, 870 (1990) [hereinafter *Englund.*]

After identifying the ultimate function, a programmer develops an outline for the program. 3 *Nimmer* § 13.03[F], at 13–85. The programmer "decomposes that function into simpler constituent problems or 'subtasks.'" *Englund* at 870. The portion of a program implementing a subtask is sometimes called a module or a subroutine. *Id.* at 871; 3 *Nimmer* § 13.03[F], at 13–85. A module or subroutine is "a relatively short sequence of instructions in some programming language that, when executed, performs some well-defined function that is one of the subtasks defined in the course of decomposing the ultimate function of the program." *Englund* at 871. "The functions of the modules in a program, together with each module's relationship to other modules constitute the 'structure' of the program." *Id.* The structure is the nonliteral aspect of computer programs.

After designing the program conceptually, the programmer writes instructions in a "written language that the computer can read." *Altai,*

ed to the substantial similarity analysis for computer programs. *See* 3 *Nimmer* § 13.-03[F][1].

The trial judge here recognized that at the "highest and most general" level of abstraction the Autoskill program is "a reading program designed to diagnose, re-mediate and teach reading skills through the use of the computer." 793 F.Supp. at 1566. · This level was thus treated as "idea" matter, not entitled to protection. Then the judge also excluded from the area of protection Autoskill's use of the three subtypes of students with reading difficulties—types O, A, and S—explaining that "[b]ecause these particular subtypes are identified and discussed in the literature available to the public, Autoskill is not entitled to protection from their use by others with testing or, diagnosing, profiling and training." *Id.* at 1566. The judge explained that "[t]he identification of those subtypes by researchers would be of little val-ue[ ] if such theories were not allowed practical application to real students" and that to "allow such protection would grant Autoskill a virtual monopoly over those concepts and serve to thwart efforts of others to build upon them." *Id.* (citing *Feist,* —— U.S. at ——, 111 S.Ct. at 1290).

The judge ruled, however, that "[t]he manner in which Autoskill utilizes those ideas and communicates them to students and teachers in the context of its reading program amounts to expression. Such expression can extend to the organization, structure and sequence if they are original." *Id.* The judge then proceeded to consider "Protectible v. Non–Protectible Expression," *id.,* in his subsequent filtration analysis when he determined which elements of expression survived for protection. We treat filtration below.

NESS essentially makes two complaints about the abstractions analysis of the trial judge. First, there is a generalized criticism that he erred when he "proceeded to examine the similarities in the highest level of abstraction (the functions performed) between Autoskill and NESS' programs." Appellant's Brief at 32.

We disagree. As noted, we feel that the judge used a permissible method of analysis and reached reasonable conclusions, although we are not deciding which precise method of analysis should be followed in a final copyright decision. Under the abstractions analysis outlined in *Altai* a judge essentially retraces, in reverse order, the steps taken by the program's designer, beginning with the.code and ending with the program's ultimate function. *Altai,* 982 F.2d at 707. It is true that the trial judge's analysis and conclusions here do not reveal precisely the abstractions analysis outlined in *Altai,* cited by both NESS and Autoskill. However, we feel we should focus on the court's findings and conclusions, and his resulting ruling on protectable areas of expression, rather than on the precise method of analysis the judge used.

We are not persuaded at this preliminary injunction stage that the judge's rulings should be reversed simply because of a lack of any particular detail in his analysis. *See Altai,* 982 F.2d at 714 ("While the facts of a different case might require that a district court draw a more particularized blueprint of a program's overall structure, this description is a workable one for the case at hand."). Moreover, we find no persuasive presentation by NESS of any conflicting abstractions analysis which was presented below. We feel the record amply supports the judge's conclusions made as to the nonprotectable and protectable features of the Autoskill program for the purposes of a preliminary injunction.

We are convinced that the record furnishes an ample factual basis for the trial judge's analysis on the levels of abstraction and his conclusions as to which were idea

---

982 F.2d at 698; *see* 3 *Nimmer* § 13.03[F], at 13-85. The programmer usually writes a "source code" in one of several computer languages. *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1230 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). The source code then is translated into an "object code," which is a binary code in 0s and 1s. *Id.* at 1230–31. These codes, which are the literal aspects of computer programs, are protectable by copyright. *Altai,* 982 F.2d at 702; *see also Whelan,* 797 F.2d at 1233 (listing cases).

Autoskill does not claim infringement of its source code. 793 F.Supp. at 1563.

levels not entitled to protection, and which were in the expression area and possibly eligible for protection after filtration analysis. There was detailed testimony by Autoskill's expert, Dr. Olson,[19] that recognized the highest two levels of abstraction demonstrated in Autoskill's Exhibit AC, Appellee's Supp.App. at 319, as unprotectable idea levels. Dr. Olson explained that it was below the highest two levels of abstraction that "we are starting to get into some very specific aspects of expression of those top two level ideas."[20] Appellee's Supp.App. at 157. As the judge noted, the experts' opinions may be helpful, but their legal conclusions on these points are not binding. 793 F.Supp. at 1570. The consideration of the experts' views on these matters in drawing the judge's conclusions was within his discretion and not error. *Altai*, 982 F.2d at 713–14.

Second, NESS argues that the judge erroneously prevented the use by others of educational processes, methods and procedures, Appellant's Brief at 23–25, citing 17 U.S.C. § 102(b) and its provision that copyright protection does not extend to "any idea, procedure, or process, [or] system. . . ." We are not persuaded. The judge explicitly dealt with § 102(b) and pointed out that more than literal application of the statute is required. *See Toro Co. v. R & R Prods. Co.*, 787 F.2d

1208, 1211–12 (8th Cir.1986). He faced up to the need to deal with the idea/expression dichotomy, appropriately analyzing the dichotomy as discussed in *Baker v. Selden*. 793 F.Supp. at 1564. In his abstractions analysis and conclusions he excluded from protection the highest two levels of abstraction in the Autoskill program, as we have noted above, and left only the lower levels for further consideration in his filtration discussion and possible protection.

In sum, we are not convinced that NESS has demonstrated any reversible error in the trial judge's abstractions analysis. For purposes of review of a preliminary injunction, on this issue we feel that Autoskill has shown a substantial likelihood of success.

### 2. The Filtration Analysis

■ Under the second step of his analysis—filtration—the judge considered whether any of the expression of the Autoskill program should be excluded from copyright protection. The step requires that a court examine the program's "structural components at each level of abstraction" to determine whether they are excludable under traditional copyright doctrines. *Altai*, 982 F.2d at 707.[21] By removing unprotected expression

---

**19.** NESS challenges the reliance of the trial judge on testimony of Autoskill's experts, particularly Dr. Olson, who was admittedly not a programmer.

In his findings the judge analyzed carefully the qualifications of the experts. 793 F.Supp. at 1561. He referred to Dr. Olson's strong background in reading education and the use of software in reading education. Dr. Olson detailed his academic credentials, including his Ph.D. in psychology. Appellee's Supp.App. at 133–34. Olson pointed out his focus on reading and working with children with reading disabilities for approximately the past 15 years. For six or seven years Dr. Olson had been involved in research regarding the use of software in reading and he had personally designed reading education software. He stated that he was not a "programmer." *Id.* at 134. He directed the basic design of the project and how the studies are to be run in the schools, and had authored about 39 publications related to reading, 14 of which were related to software also. *Id.* at 134–35.

We are satisfied the findings of the trial judge on the qualifications of the experts were not clearly erroneous and that he did not abuse his

discretion in the weight he gave to their testimony.

**20.** Exhibit AC diagramed the "Levels of Abstraction Approach." It broke them down into: (I) recognition that at highest level of abstraction both programs share common ideas of using a computer to diagnose, remediate and teach reading skills; (II) distinctions between subtypes in diagnosis and training; (III) specific subtypes diagnosis and training of Type O, A, and S; and (IV) details of testing and training.

**21.** *Altai* defined the filtration step as the step in which a court examines "the structural components at each level of abstraction to determine whether their particular inclusion at that level was 'idea' or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression." 982 F.2d at 707. The judge in this case expressly analyzed the Autoskill program under the idea/expression dichotomy in his abstraction analysis, as we have noted earlier. We conclude this difference in labelling of the analyses was unimportant.

from the analysis, the filtration step "serves 'the purpose of defining the scope of plaintiff's copyright.'" 982 F.2d at 707 (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475 (9th Cir.1992)); *see* 3 *Nimmer* § 13.03[C], at 13–71.

■ Applying the related copyright doctrines of merger and scènes à faire, the judge filtered out two aspects of the Autoskill program. The merger doctrine excludes expression from copyright protection if it is "merged" inseparably with an idea. 3 *Nimmer* § 13.03[B][3], at 13–65. The judge filtered out the 13 categories of vowel and consonant combinations used in the Autoskill program because he concluded they were an aspect of expression that is dictated by teaching reading in English, and thus is merged with the idea of the reading program. 793 F.Supp. at 1568.

■ The judge also addressed whether any aspects of the expression in the Autoskill program were merged with the idea of testing and training the three subtypes of readers, and thus were nonprotectable. The judge found "no evidence that the idea of testing, diagnosing and training the particular sub-types could be expressed in only one way." *Id.* at 1560. The judge also found that the "idea of testing, diagnosing and training the particular sub-types is capable of being expressed in more than one way." *Id.* Thus the judge held that the idea of the Autoskill program for testing, diagnosing, and training the three subtypes need not be denied copyright protection under the merger doctrine. *Id.* at 1567.

NESS does not specifically challenge the judge's factual findings on merger, but instead makes a general argument that the judge's ruling conflicts with the merger doctrine. Appellant's Brief at 33. We are not persuaded by this unsupported, vague argument and feel that the judge's findings were not clearly erroneous and that he properly concluded he should· deny exclusion on the merger theory.

■ The scènes à faire doctrine in general excludes from copyright protection material that is "standard," "stock," or "common" to a particular topic, or that "necessarily follow[s] from a common theme or setting." 3 *Nimmer* § 13.03[B][4], at 13–70. Applying this doctrine, the judge also filtered out the "silent sentence" and "silent paragraph" components of the Autoskill program because he concluded they were "so standard to the field that they cannot be afforded protection." 793 F.Supp. at 1568.

■ NESS further contends that the trial judge erred in the filtration analysis by not finding that the components of the Autoskill program at issue were either scènes à faire matter, or were taken from the public domain. Any components of the program that were taken from the public domain would be "free for the taking." *Altai*, 982 F.2d at 710. "It is axiomatic that material in the public domain is not protected by copyright, even when incorporated into a copyrighted work." 3 *Nimmer* § 13.03[F][4], at 13–98. NESS contends that features of the Autoskill program sought to be protected were taken from the Doehring study upon which the Autoskill program was based and were common and obvious methods of testing subjects. Appellant's Brief at 34–37.

Autoskill argues in response that its program involves substantial additional elements constituting original expression as shown by the testimony of Dr. Olson and Dr. Moya on the uniqueness of the Autoskill program, and by the testimony of Dr. Trites and Dr. Fiedorowicz on necessary changes and differences from Doehring's approach. Appellee's Brief at 42–43.

The trial judge did not discuss the public domain issue in those precise terms, but he made findings dealing with the substance of this contention. His findings stated that he was persuaded by the testimony of Dr. Olson and Dr. Moya. He cited their testimony on the many unique aspects of the Autoskill program and found that the opposing testimony of Dr. Norton of lack of uniqueness of the Autoskill program was less convincing than that of Dr. Olson and Dr. Moya. 793 F.Supp. at 1561 (findings Nos. 53, 54).

■ One of Autoskill's witnesses, Dr.

Trites,[22] explained that Autoskill did not simply use Dr. Doehring's theories in a computerized form, but instead had to make "significant changes" to Dr. Doehring's techniques to develop effective training programs. Appellee's Supp.App. at 24. As an example of the process used in developing the Autoskill program, Dr. Trites explained that the original Autoskill testing to determine the reading subtypes was dependent on having a touch-sensitive screen on the computer. He further explained that the Autoskill system did not simply involve touching keys 1, 2, or 3, but involved looking at the word on the screen and responding with hands on the keyboard, a system that took considerable investigation and research staff work, and also that of statisticians and programmers. *Id.* at 25. This testimony shows that the Autoskill program was unique and was not drawn directly from the Doehring research.[23]

As to uniqueness, Dr. Trites testified that the Autoskill program tested for 39 subskills, which were not the same subskills tested in the Doehring research. Dr. Trites testified that the NESS program used the same 39 subskills, which was not necessary because there were thousands of possible choices that could have been made. For example, he

pointed out that while Autoskill used "CVCC" syllables, other skills could have been selected. *Id.* at 27.

Another witness whose testimony was relevant to uniqueness, Dr. Moya,[24] explained that there was uniqueness in the Autoskill program in the manner in which it used the computer to record mastery and speed of response. The automaticity theory that Autoskill utilizes was not found in the other software programs. Dr. Moya also pointed to their manner of continuous reinforcement of the students, offering 50 trials to reinforce a student's response, as unique. He also mentioned Autoskill's presentation of graphs and its immediate feedback which was not found in other software programs. *Id.* at 267. In addition, he described the way that Autoskill assessed the abilities of students and divided them into three distinct subtypes, and then prescribed training according to those subtypes. In reporting to the superintendent, the committee considered this uniqueness of the Autoskill program in its recommendation, feeling that they had finally located a software program that was going to impact the reading instructional program in their school system and in their southwest

---

22. Dr. Trites is a principal in Autoskill, as is his wife, Dr. Fiedorowicz. Dr. Trites has been a computer programmer who worked with Burroughs Corporation, now Unisys. Appellee's Supp.App. at 23.

23. This proof also disposes of a related argument. NESS contends that the judge erred in protecting the keying procedure the Autoskill program provides for students to respond to the audio-visual matching test. In the test, a student selects a response by pressing the 1, 2, or 3 keys. 793 F.Supp. at 1569. NESS argues that this is a "method" not protected by copyright. As noted, 17 U.S.C. § 102(b) precludes copyright protection for any "process" or "method of operation." But, as we have stated, we must go beyond the literal language of the statute and apply the idea/expression distinction to resolve this issue. *See Toro Co.*, 787 F.2d at 1211–12.

Copyright protection extends to any "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The nonliteral aspects of computer programs certainly can be subject to copyright protection. "To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was

independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist,* —— U.S. at ——, 111 S.Ct. at 1287 (citation omitted). We think, for the purposes of the preliminary injunction, that the record showed that the keying procedure reflected at least a minimal degree of creativity. Further, NESS has not pointed to substantial evidence in the record that this procedure was such a common practice, or that it was dictated by efficiency considerations, so that it should have been filtered out of the analysis.

24. Dr. Moya, who was the staff psychologist of the San Benedito School System of South Texas, had experience with computer software used in a program for project management. The school system used the computer program to track juveniles coming into the criminal justice system with unidentified learning disabilities. Dr. Moya was chair of a committee reviewing hardware and software for use in reading education. Appellee's Supp.App. at 259–61. The committee reviewed several software programs, including that of Autoskill. Dr. Moya personally operated each of the reading education software products for several hours. The committee selected the Autoskill software for their school.

area where reading scores are very low. *Id.* at 268–69.

. As another point of departure from the Doehring research, Dr. Trites explained that the Autoskill program emphasized errors as being more important than latency, a decision based on years of research. *Id.* at 28. Also, Dr. Trites testified that the Autoskill program contained unique aspects in assessing the subtypes of readers; to his knowledge, no programs other than Autoskill do a diagnostic assessment for a profile indicating a subtype of reading difficulty. *Id.* at 35.

Turning to NESS' witnesses, Dr. Norton testified that she operated the Autoskill program for at least an hour. Appellee's Supp. App. at 250. She was asked about the subtype approach as defined by Doehring and Hoshko. She said she knew that concept through the learning disabilities literature and "that there are learner characteristics or subskills to the overall word recognition that draw a different perceptual strength." *Id.* at 253. She agreed that in other reading software she was aware of there is no norm of using the zero and one keys in the same way that they are used in the Autoskill and NESS programs. *Id.* at 256. She also said there are no other marketed programs that pursue a sequence of 13, 14, or 15 skill patterns using sense and nonsense words; but she explained that there was software around that used the sense and nonsense words and Dr. Norton herself designed a program to teach the patterns they were talking about in 1980 or 1981. She found a lack of interest in it because some publishers she contacted "did not see computers in the schools...." *Id.* at 257–58.

We note that the trial judge accepted Dr. Olson's testimony that no other programs of which he was aware used alternating sense and nonsense words. 793 F.Supp. at 1569. In light of the uncertainty in Dr. Norton's testimony on the point we cannot say the judge's acceptance of Olson's testimony was clearly erroneous.

Thus the judge heard considerable testimony that suggests that the Autoskill program was not identical to the testing outlined in the Doehring study. We feel that this evidence refutes NESS' argument that the Autoskill program was taken entirely from the public domain or was so standard to the topic as to be unprotectable scènes à faire material.

NESS also contends that the oral reading test in the Autoskill program is not subject to copyright protection because it is the equivalent of using flash cards, a method which it argues is taken from the public domain or is akin to scènes à faire material. In support of the argument NESS refers, in part, to testimony comparing the "visual training mode" of the Autoskill program to "a computerized version of a human presenting flash cards and holding them up." Appellant's App. at 358. NESS' generalized complaints are not supported by substantial evidence that the Autoskill oral reading test contained no original expression.

In sum, we are convinced that the expert testimony and the exhibits furnish a substantial basis for the trial judge's conclusion that there are protectable elements in the Autoskill program that survive the filtration process.

### 3. The Comparison

Finally, after conducting an analysis to filter out the nonprotectable material, the judge attempted to compare the remaining "core" of material, the copyrightable expression. *See* 3 *Nimmer* § 13.03[F], at 13–99. "Once a court has sifted out all elements of the allegedly infringed program which are 'ideas' or are [other unprotected material], there may remain a core of protectable expression." *Altai,* 982 F.2d at 710. The analysis at this point "poses essentially a value judgment, involving an assessment of the importance of the material that was copied." 3 *Nimmer* § 13.03[F], at 13–102; *see Altai,* 982 F.2d at 710.

NESS concedes "there are many similarities in the two programs," but contends that after filtration there is no protectable expression remaining to compare. Reply Brief of Appellant at 18. Having rejected NESS' arguments concerning the filtration step, we disagree. We think the judge, after his comparison analysis, had an adequate basis for observing "many significant

similarities" in the protectable aspects of the Autoskill program and the allegedly infringing NESS program. 793 F.Supp. at 1569.[25]

The judge identified similarities in the three basic tests used in the programs. The judge concluded that in the oral reading tests in both programs, "a word or words come up on the screen and the student attempts to read it orally" and both programs "require a trainer to decide whether or not the word is read correctly and to record speed and accuracy into the computer." The judge concluded that in the auditory visual matching test, or audio identification test, in both programs "three word choices appear on the screen and an auditory stimulus of a target word or nonsense word is presented to the student. The student must select which word he hears and indicate his response by hitting the 1, 2 or 3 key." *Id.* In the visual match, or visual identification, test in both programs, the judge concluded, "the screen displays four words or nonsense words. The target word is isolated from the other words and the student is expected to choose one of the remaining three words which is identical to the target word." *Id.*

The judge noted that both programs use alternating words and nonsense words. The judge concluded that both programs record speed, or latency of response, and accuracy data and use the information in the same manner. *Id.* Further, the judge concluded that in both programs the students are trained according to the same three testing topics. In both programs, the judge noted, students receive immediate feedback about accuracy. The judge concluded that the criteria for a student's progressing to the next subprogram is similar in both programs. Further, the judge noted that in both programs: the presentation of skills proceeds hierarchically from the simple to the complex; a visual scanning test is administered in combination with the other tests to determine the student's subtype; matrices record

student progress within each section; and graphs are used for the same purposes. *Id.*

To show lack of similarity of the Autoskill and NESS programs, a prime witness for NESS was Mr. Johnson–Laird. The trial judge noted his strong background in computer software but said he has no background in the area of reading education or its software. *Id.* at 1561. Johnson–Laird's testimony particularly sought to prove lack of similarity between the NESS and Autoskill programs. He presented charts showing differences in logic flow between the display screens of both programs.

We have examined the testimony of Mr. Johnson–Laird on these points, *e.g.,* Appellant's App. at 317–328, and Ex. 10, photographs of the program screens, *id.* at 473–78, used in his testimony. He said the Autoskill screen does have elements, similar to that of NESS, that were arguably protectable, Appellant's App. at 397, identifying "the matrices here, when you take them as an entire entity." *Id.* at 398; *see also id.* at 400–401. He said, however, that there was not substantial similarity in the look and feel of the Autoskill and NESS screens, stressing the way NESS uses color. *Id.* at 401–03. He referred also to the fact that in the NESS program, one's voice could be recorded and played back, which was not done on the Autoskill program. *Id.* at 442.

The judge explained that he rejected NESS' suggestions of differences because the differences (color in NESS' program absent in Autoskill's, word choices appearing in phases in NESS' program while those on the Autoskill screen appear at the same time) were not important or substantial parts of Autoskill's program. The judge gave greater weight to Dr. Olson's testimony that the differences were not pedagogically significant. 793 F.Supp. at 1570–71. We are satisfied the judge's crediting of the Autoskill witness' testimony over that of NESS' wit-

---

25. The judge considered expert testimony about the similarities between the programs, including an expert's views "as to what [the witness] believed legal conclusions should be in a number of areas based upon his review of legal materials and the programs at issue." 793 F.Supp. at 1568. The judge explained, however, that he "need not rely on such [legal] conclusions." *Id.* We feel that the judge properly viewed the legal conclusions as matters for the court to decide.

**1498**

ness was not clearly erroneous or an abuse of discretion.[26]

In sum, we affirm the judge's conclusion that Autoskill satisfied its burden on the substantial similarity requirement for purposes of the preliminary injunction. Having satisfied its burden at this stage on both elements required to show copying—access and substantial similarity—Autoskill thus demonstrated a substantial likelihood of success on the merits. Our ruling, of course, is for purposes of the preliminary injunction alone and does not represent a final determination on the substantial similarity issue.

### B. Irreparable Harm

█ The district judge held that Autoskill had made the requisite showing of irreparable harm on two alternative grounds. First, the judge applied the rule a leading commentary describes as the prevailing one in the circuits: a showing of a prima facie case of copyright infringement or of a reasonable likelihood of success on the merits usually raises a presumption of irreparable harm for preliminary injunction purposes. 3 Nimmer § 14.06[A], at 14–78.13 to –78.14; 793 F.Supp. at 1572. We need not decide whether to adopt that test because of the second ground on which the trial judge found irreparable injury—one that is independently sufficient.

In his second holding on irreparable injury, the judge cited testimony that from NESS' conduct, Autoskill "will suffer from a loss of uniqueness in the marketplace." 793 F.Supp. at 1572. The judge also noted testimony that if the NESS program produced poor results, "such results would affect Autoskill's reputation." Id. Further, the judge noted testimony that Autoskill "had no way of ascertaining how many customers were lost to NESS." Id. On the basis of this evidence, the judge held that Autoskill had demonstrated irreparable harm by presenting evidence that the NESS program "jeopardizes Autoskill's investment and competitive position and thus shows irreparable harm." Id.

We are satisfied that the judge's conclusion that a danger of irreparable harm was shown was not in error.

### C. Balance of Hardships

█ Autoskill was also required to demonstrate that the injury it would sustain if the injunction did not issue outweighed the potential harm that the injunction would cause to NESS. See Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 356–57 (10th Cir. 1986). The district judge observed that while NESS argued that the injunction would have a devastating impact on its business, it presented no evidence to support the contention. 793 F.Supp. at 1572. However, even assuming the injunction would have such a devastating effect on NESS, the judge adopted the reasoning of other courts that "a knowing infringer cannot be 'permitted to construct its business around its infringement.'" Id. (quoting Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir.1983)). Thus the judge made a primarily legal ruling on the factor.

Autoskill's burden on this factor was to demonstrate that the harm it would sustain without an injunction outweighed the potential harm of an injunction to NESS. Autoskill presented evidence that it would sustain at least some harm; under the usual application of the balancing test, the judge did not make it clear how this potential harm to Autoskill outweighed the harm it assumed NESS would sustain. Instead, the judge recognized that in the copyright context the four factors require sensitive weighing. Stated another way, the district judge adopted the view that the potential injury to an allegedly infringing party caused by an injunction "merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement." Georgia Television Co. v. TV News Clips of Atlanta, Inc., 718 F.Supp. 939, 949 (N.D.Ga.1989). We agree that placing too much weight on this factor would reward infringers. Under

26. During his testimony about the use of color in the screens and the difference he saw between them in this respect, Mr. Johnson–Laird said: "... I don't necessarily mean in the pedagogical

sense. I am not competent to talk about matters of teaching." Appellant's App. at 402; see also id. at 415, 416.

 

the law that the judge applied to the factor, which we rule was correct, Autoskill made a persuasive showing that the balance of the harms weighed in its favor.

### D. The Public Interest

■ On the final factor, Autoskill was required to demonstrate that the issuance of the injunction was not adverse to the public interest. *See Tri–State Generation & Transmission Ass'n, Inc.,* 805 F.2d at 357. The district court implicitly addressed this factor by acknowledging that by granting an injunction it would uphold the rights of the copyright holder. 793 F.Supp. at 1572. In copyright cases, we think this factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections. *See* 3 *Nimmer* § 14.06[A], at 14–80. The issuance of the injunction clearly was not adverse to the public interest.

### IV. CONCLUSION

In sum, in his filtration analysis the district judge denied copyright protection to two aspects of the Autoskill program, the 13 categories, or skill levels, based on different combinations of vowels and consonants, as well as the "silent sentence" and "silent paragraph" components. 793 F.Supp. at 1568. Further, for the reasons already given, the judge gave preliminary injunctive relief against infringement, due to the likelihood of success which was shown, as to the essential aspects of the Autoskill program, including: the oral reading test; the auditory visual matching test; the visual match test; the visual scanning test; alternating words and nonsense words; utilization of speed and accuracy data; use of speed and accuracy criteria; and hierarchical presentation of skills. *Id.* at 1569.

We hold that we have appellate jurisdiction and the motion to dismiss the appeal is **DE-NIED.** We hold that the district judge's findings were not clearly erroneous, his grant of the preliminary injunction was not an abuse of discretion, and the injunctive order is **AFFIRMED.** The case is **REMANDED** for further proceedings.